Travis J. CARROLL, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 26A04–0408–CR–446.

Court of Appeals of Indiana.

Feb. 28, 2005.

Anna Devoy Clutter, Princeton, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ryan D. Johanningsmeier, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Travis J. Carroll brings an interlocutory appeal of the trial court's denial of his motion to suppress. He presents the following restated issue for review: Was the warrantless search of his person proper when he was being detained while officers executed a search warrant on his residence?

We affirm.

Carroll had lived with Jody Miller in an apartment in Princeton, Indiana since April 2004. The apartment was located

approximately 450 feet from the Princeton Community Middle School. At the time, Carroll was under investigation by the Princeton Police Department (PPD) for suspicion of illegal drug activity. By June 9, 2004, investigators learned that Carroll had supplied methamphetamine to another person. On that day, Officer Mike Hurt of the PPD obtained a search warrant to search Miller and Carroll's apartment. When police arrived at the residence, Carroll's vehicle was not there, so they waited nearby for Carroll and Miller to return. When Carroll arrived at approximately 10:25 p.m. in what police recognized as his car, police confronted him and his passengers, Miller and Jacob McKendry, who was identified as Carroll's brother, while they were still in the apartment parking lot. The officers identified themselves and informed Carroll and Miller that they had a warrant to search the apartment. Carroll, who is "a pretty big guy," *Transcript* at 5, became "very belligerent, argumentative, very jerky in his motions." *Id.* Carroll was sweaty, licking his lips, and his eyes were dilated. After observing Carroll's behavior for a few minutes, Officer Hurt formed the opinion that Carroll was under the influence of methamphetamine. This, in turn, caused Officer Hurt to fear for his safety, so he placed Carroll in handcuffs and patted him down for weapons. After reading Carroll, Miller, and McKendry their advisement of *Miranda* rights, the officer told Carroll they would remove the handcuffs when he calmed down. Officer moved Carroll, Miller, and McKendry inside the apartment and commenced the search.

Miller accompanied several police officers into the kitchen and soon admitted there was marijuana located under one of the armrests of the couch in the living room. Police checked that location and found a bag containing what tests later revealed was marijuana. By that time,

Carroll had calmed down and police had removed his handcuffs. After the marijuana was found, Sergeant Hurt spoke with Carroll. PPD Officer David A. Knowles witnessed the conversation and described it as follows:

> At the time we had searched and Sergeant Hurt looked at the defendant and told him, he says, "I know that you—you've got the dope and you probably have it down your pants." And at that time he kind of lowered his head and give [sic] the indication like he was correct in what he was saying. And he was asked to stand up. He said, "I'll get it." and [sic] he walked over to the—by the bathroom and raised up his shirt and at that time Officer Hurt could see the plastic bag and he pulled it out from his beltline.

*Id.* at 19. The plastic bag that was pulled from Carroll's pants held several smaller baggies containing "an off white rock like substance, powder and rock like." *Id.* The substance in the plastic bag later tested positive for methamphetamine. Carroll informed Officer Knowles that he had just obtained the substance that evening from another individual in town, and that he was selling it for $50 for a half-gram and $25 for half that quantity. He also informed the officer he had already sold some of it earlier that evening.

On June 10, 2004, a criminal information was filed charging Carroll with dealing methamphetamine within 1000 feet of a school. On July 19, 2004, Carroll filed a motion to suppress, challenging the legality of the search of his person. The trial court denied the motion following a hearing. At Carroll's request, the trial court certified the order for interlocutory appeal. We accepted jurisdiction of the appeal on October 12, 2004, pursuant to Ind. Appellate Rule 14(B).

■ Our standard for reviewing the denial of a motion to suppress is well settled. We review such rulings in a manner similar to other sufficiency matters. *Marlowe v. State*, 786 N.E.2d 751 (Ind.Ct.App.2003). We do not reweigh the evidence, and we consider conflicting evidence most favorable to the ruling. *Id.* Unlike typical sufficiency reviews, however, we will consider not only the evidence favorable to the judgment, but also the uncontested evidence favorable to the defendant. *Id.*

■ Carroll contends the State failed to demonstrate that one of the exceptions to the warrant requirement applies to the warrantless search of his person. In essence, Carroll argues that police officers illegally detained him during the search of the apartment, and then "bootstrapped" the detention and search of his person to the legal warrant used to search his apartment. It is undisputed that the legality of the search hinges on the legality of the detention Both parties agree this case involves a question of first impression in Indiana, viz., "whether the officers executing a search warrant [have] the authority to require [a person] to re-enter the house and to remain there while they conducted their search[.]" *Brief of Appellee* at 4. The State adds that although no Indiana court has yet decided the question, the United States Supreme Court has determined in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), that such detentions are permissible under the Fourth Amendment.

The facts in *Summers* were that the defendant was descending the front steps of his home and preparing to leave when police arrived with a warrant to search his house. The defendant attempted to leave, but police prevented him from doing so. When officers executed the warrant, they discovered a bag containing what appeared to be illegal narcotics. The defendant was placed under arrest and a custodial search of his person revealed a quantity of what appeared to be heroin in his pocket. That heroin formed the basis of a charge of possession of narcotics. The defendant sought to suppress that evidence on the ground that it was the fruit of an illegal search. That contention, in turn, was based upon the argument that his detention while the house was being searched was illegal under the Fourth Amendment. The Michigan Supreme Court agreed with that contention and reversed the conviction. The Michigan Attorney General appealed that decision to the United States Supreme Court, which reversed the Michigan high court's ruling.

The Court concluded in *Summers* that the legality of the search itself depended entirely upon the legality of the detention. It noted that at the time of the arrest, the officers had developed probable cause to search his person by virtue of the discovery of narcotics in his house. But, were authorities empowered to detain the defendant during the search in the first place? The Court concluded they were. Noting that the detention of an individual under those circumstances constitutes a seizure within the meaning of Fourth Amendment jurisprudence, the court observed the general rule is that a seizure must be supported by probable cause. The court then discussed exceptions to the general rule, specifically a line of cases involving seizures that, although "admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699, 101 S.Ct. 2587. The court proceeded to an examination of whether the general rule applies in this type of case, or

whether an exception should be created. In so doing, the court examined two criteria: (1) the character of the official intrusion, as well as (2) its justification. That discussion, reproduced here, is relevant in the instant case. The court first discussed the nature of the intrusion:

> Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondents house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself. Indeed, we may safely assume that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions. Furthermore, the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondents own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.

*Id.* at 701–02, 101 S.Ct. 2587 (footnotes omitted). Next, the court examined the justification:

> In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Cf. 2 W. LaFave, Search and Seizure 4.9, pp. 150–151 (1978). Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

*Id.* at 702–03, 101 S.Ct. 2587 (footnote omitted).

Finally, the court considered a third criterion: the nature of the articulable suspicion on which the police based the detention of an occupant of a home subject to a search warrant. The Court concluded that the search warrants very existence provides an objective justification for the detention. By virtue of the warrant, we know that a judicial officer has determined that authorities have probable cause to believe someone in the subject home is committing a crime. *Id.* Therefore, the decision to allow police to "thrust themselves into the privacy of a home", *id.* at 703, 101 S.Ct. 2587, is made by a neutral magistrate rather than an officer in the field. "The connection of an occupant to that home gives the police officer an easily

identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 704, 101 S.Ct. 2587. Thus, the Court held, if "the evidence that a citizens residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizens privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." *Id.* at 704–05, 101 S.Ct. 2587.

It appears to this court that all of the relevant facts in the instant case are substantially similar to those in *Summers.* The defendant in each case was an occupant of the house being served, was outside the house when the search warrant was served, was not allowed to leave, but instead taken inside the house while the house was being searched, and after contraband was found in the house, the defendants person was searched, and further contraband was discovered thereby. Clearly, the detention and search of Carrolls person was consistent with Fourth Amendment principles under *Summers.*

■ All that remains is to determine whether Carroll is entitled to relief under Article I, Section 11 of the Indiana Constitution, which is our state counterpart to the Fourth Amendment of the United States Constitution. The State contends that Carroll did not preserve a claim under that provision. We agree. So far as we can tell, Carroll has referred to Article I, Section 11 only twice while presenting and appealing this issue. Paragraph 7 of his Motion to Suppress Evidence stated: "The search was conducted in violation of the Defendants rights secured by the Constitution of the United States under the Fourth, Fifth, Sixth, and Fourteenth Amendments, and also under the [sic] Article I, Section [sic] 11 of the Indiana Constitution." *Appellants Appendix* at 8. The second reference to the Indiana Constitution is found in the final sentence of Carrolls appellate brief, which states, "The detainment and subsequent search of Carroll was in violation of rights secured by the Constitution of the United States under the Fourth, Fifth, Sixth, and Fourteenth Amendments, and under Article I, Section 11 of the Indiana Constitution[.]" *Appellants Brief* at 9.

As the foregoing reflects, Carroll has offered nothing more than passing references to the Indiana constitutional provision. We have consistently held that more is required when making an argument based specifically on a provision of the Indiana Constitution, especially when, as here, the defendant can prevail only by establishing that the scope and effect of the Indiana provision differs from its federal counterpart. *See, e.g., Rybolt v. State,* 770 N.E.2d 935, 942 n. 2 (Ind.Ct.App.2002) (the defendant "fail[ed] to provide an independent analysis of Article I, Section 11 of the Indiana Constitution," and "the failure to make a cogent argument under Article I, Section 11 of the Indiana Constitution constitutes waiver of the issue on appeal"), *trans. denied.*

In responding to the States waiver claim, Carroll contends the onus is upon the State because "[w]hen a defendant challenges the admissibility of evidence based on a violation of the Federal and State Constitutions, then the State bears the burden of proving the evidence was admissible." *Appellants Reply Brief* at 3. In fact, the onus *does* rest upon the State when, at the trial court level, a defendant challenges a search or seizure on constitutional grounds. Such occurred here. Carroll mounted a constitutional challenge to the admissibility of the fruits of the search of his person. Although his motion invoked both the United States and Indiana Constitutions by name, his argument was framed exclusively in terms of the federal provision. The State responded accord-

ingly, and the trial courts determination reflects its conclusion that the seizure was permissible under both the Fourth Amendment and Article I, Section 11, notwithstanding that Carrolls argument did not specifically address the Indiana provision.

Carrolls argument below, the trial courts ruling, and Carrolls argument on appeal implicitly assume that the analysis under Article I, Section 11 is the same as the analysis under the Fourth Amendment. Were it otherwise, we presume Carroll would have offered different analyses under each provision. Be that as it may, the two provisions are identical and no Indiana case has recognized a distinction between them. If indeed the scope of Article I, Section 11 is identical to that of the Fourth Amendment, *Summers* settles the question under both. If, on the other hand, the Indiana provision should be interpreted differently, it was incumbent upon Carroll to make that argument. He did not do that below, and he makes no such argument on appeal.

In summary, the State carried its burden of proving that the seizure was proper under the Fourth Amendment—and hence, Article I, Section 11. Carroll has failed to present an argument that the analysis under the Indiana Constitution differs from the analysis under the United States Constitution, as set forth in *Summers*. Therefore, Carroll waived the issue of the legality, under Article I, Section 11, of his detention while his apartment was being searched because it required a separate and distinct analysis under that provision. *See Rybolt v. State*, 770 N.E.2d 935.

Ruling affirmed.

SHARPNACK, J., and BAKER, J., concur.