ATTORNEYS FOR APPELLANT
James W. McNew
Jon A. Keyes
Greenfield, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court



_____

No. 30S01-1303-CR-220

DANIELLE KELLY,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the Hancock Circuit Court, No. 30C01-1009-FA-209
The Honorable Richard D. Culver, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 30A01-1112-CR-584

_____

**November 21, 2013**

**Massa, Justice.**

Danielle Kelly here appeals the denial of her motion to suppress evidence found in a search of her vehicle and inculpatory statements she made to police. We reverse.

**Facts and Procedural History**

On September 15, 2010, Sergeant Michael Fuller of the Fortville Police Department received a phone call from dispatch to inform him that Ms. Carolyn Goodwin wished to speak with him. After talking to Goodwin on the phone, Sergeant Fuller went to Goodwin's home, and she told him that in an effort to "help clean up her community" she had arranged a sort of amateur sting operation. Tr. at 10. Specifically, Goodwin stated she "knew of" an African-American man from Indianapolis who had been selling cocaine to several of her friends in Fortville bars, and she became "tired of seeing it," so she obtained his phone number and arranged to purchase some cocaine from him.[1] Tr. at 11. This man, Goodwin told Sergeant Fuller, was now on his way to her home to make delivery, but she had no money to pay him, and she was afraid he had a gun and would harm her. Goodwin did not provide Sergeant Fuller with the man's name or any further physical description of him or his vehicle.

Sergeant Fuller proceeded to Goodwin's home. After he arrived, he overheard Goodwin taking several phone calls from a man asking directions to her residence, but he never heard Goodwin mention drugs during the calls. In anticipation of the caller's arrival, Sergeant Fuller contacted Fortville Police Chief Benjamin Kiphart and another officer for assistance, and they waited outside in the squad car while Sergeant Fuller waited inside with Goodwin.

Soon, a vehicle pulled into a parking lot near Goodwin's home. Kelly's cousin, Lamont A. Day, was driving, and Kelly was sitting in the passenger seat. Goodwin confirmed that Day was the man she had been expecting. Police approached the vehicle with their guns drawn, ordered Kelly and Day to exit the vehicle, and handcuffed them. Chief Kiphart began to

---

[1] At this point, Sergeant Fuller informed Goodwin that despite her "good intentions[,] she should have [gone] about this a different way." App. at 10. We agree. While Goodwin's concern and motivation presumably were legitimate, the better and safer course would have been to leave this kind of "set up" to trained law enforcement officers.

interview Kelly in the parking lot while Sergeant Fuller and another officer began an inventory search of the vehicle. During that search, the officers came upon a screwdriver with a yellow handle; the handle had been hollowed out, and they found cocaine inside.

Some portion of Chief Kiphart's interview with Kelly in the parking lot was recorded on his shoulder mic camera. The video shows Kelly sitting on the front bumper of her car with her hands cuffed behind her back. Chief Kiphart informed Kelly they had found the cocaine:

> Chief Kiphart: "Well, he didn't throw it out the window. It's still in the car."
>
> Kelly: "OK, well, I didn't know that. Oh Lord."
>
> Chief Kiphart: "You said you knew about it."
>
> Kelly: "I did know about it, but he said he felt something when we passed McCordsville and seen the red car."
>
> Chief Kiphart: "OK. Well, unfortunately, you knew about it. It was in the car.
>
> Kelly: "OK."
>
> Chief Kiphart: "So . . ."

Ex. 1 at 21:19. At this point, Kelly rose to her feet and turned to her left side.

> Kelly: "Can we go now?"
>
> Chief Kiphart: "Nope. You're gonna sit down there. Right now."
>
> Kelly: "I don't feel like sitting right now. My nerves are bad. I just need to breathe."
>
> Chief Kiphart: "Sit down, please, before I put you down."
>
> Kelly: "This car is hot. It's really hot."
>
> Chief Kiphart: "OK, it's not that hot."

3

Kelly: "Yes, it—"

Chief Kiphart: "Sit down before you get yourself in more trouble."

Ex. 1 at 21:42. Kelly sat back down on the front bumper of the car.

Kelly: "I can't breathe."

Chief Kiphart: "You are smart, right?"

Kelly: "Yes."

Chief Kiphart: "OK."

Kelly: "I'm just trying to get home to my baby . . . [inaudible]"

Chief Kiphart: "What's your name?"

Kelly: "My name is Danielle Kelly."

Chief Kiphart: "Danielle, OK."

Kelly: "Oh, Lord."

Chief Kiphart: "You ever heard of Miranda warning?"

Kelly: [shaking her head]

Chief Kiphart: "OK. Miranda warning—I'm gonna read this to you, OK? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to speak with a lawyer before you're asked any questions and have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you. Do you understand your rights?"

Kelly: [nodding]

Chief Kiphart: "OK. Do you want to answer any questions?

Kelly: "How soon can I have a phone call?"

Chief Kiphart: "You can have a phone call when you go to jail."

4

Kelly:  "My parents going to kill me . . ."

Chief Kiphart:  "Do you wish to answer any questions now?"

Kelly:  "What am I going to jail for?"

Chief Kiphart:  "Do you want to be cooperative with us?  At this point right now, probably possession of cocaine and intent to deal."

Kelly:  "But I wasn't dealing."

Chief Kiphart:  "You were in the vehicle."

Kelly:  "But—at the time . . ."

Chief Kiphart:  "You knew about it.  You knew your cousin had cocaine on him.  It is your car.

Kelly:  "OK."

Chief Kiphart:  "I mean, they just keep stacking up."

Kelly:  "OK."

Chief Kiphart:  "You said.  You told me."

*****

Chief Kiphart:  "Did he say what he was riding for?"

Kelly:  "No."

Chief Kiphart:  "Oh.  That's not what you told me, like, thirty seconds ago."

Another Officer:  "You just told us you did."

Chief Kiphart:  "You knew he had the cocaine."

Kelly:  "Yeah.  Once he . . ."

Chief Kiphart:  "Once you got in the car, you knew he had it.  You should have said 'Get out.'"

5

Kelly: "Not—not at the beginning."

Ex. 1 at 21:55.

Kelly was charged with two Class A felonies: dealing in cocaine within one thousand feet of a public park or youth program center (Ind. Code § 35-48-4-1 (2008 & Supp. 2013)), and possession of cocaine within one thousand feet of a public park or youth program center (Ind. Code § 35-48-4-6 (2008 & Supp. 2013)). By counsel, she moved to suppress the evidence found during the search of her vehicle and the statements she made to Chief Kiphart, arguing both were obtained in violation of her state and federal constitutional rights. At a hearing on the motion, Sergeant Fuller testified Goodwin had never served as an informant before. He knew she was an alcoholic and drank daily, but he didn't recall whether she was intoxicated when he saw her on September 15. Sergeant Fuller also testified that at the time the officers stopped the car and ordered the occupants out at gunpoint, the only evidence he had that Kelly was involved in illegal activity was her presence in the car. Chief Kiphart testified as well, asserting he read Kelly her <u>Miranda</u> rights before the cocaine was found and before he asked Kelly any questions.[2] The trial court ultimately denied Kelly's motion except as to the statements she made before she received the <u>Miranda</u> warning.

At Kelly's request, the trial court certified that order for interlocutory appeal, and the Court of Appeals accepted jurisdiction. <u>Kelly v. State</u>, 2012 WL 3755693 (Ind. Ct. App. Aug. 30, 2012) at *2. In an unpublished opinion, the panel affirmed the trial court's order. <u>Id.</u> at *8. Kelly sought rehearing, and the panel granted her request, but affirmed its original opinion in all respects, writing only to confirm that it weighed Chief Kiphart's references to Kelly's pre-warning admission during post-warning questioning but found they did not amount to coercion. <u>Kelly v. State</u>, 2013 WL 210275 (Ind. Ct. App. Jan. 18, 2013) at *2.

---

[2] Chief Kiphart's testimony was apparently inaccurate on this point; the State concedes "police erred when questioning [Kelly] prior to reading her rights to her." Appellee's Br. at 14.

We granted transfer. Kelly v. State, 985 N.E.2d 338 (Ind. 2013) (table); Ind. Appellate Rule 58(A).

## Standard of Review

When reviewing a trial court's denial of a defendant's motion to suppress, as in sufficiency of evidence analysis generally, we construe conflicting evidence in the light most favorable to the ruling. Holder v. State, 847 N.E.2d 930, 935 (Ind. 2006). In the particular context of a motion to suppress, however, we will also consider any substantial and uncontested evidence favorable to the defendant. Id. (citing Murphy v. State, 747 N.E.2d 557, 559 (Ind. 2001); Ogle v. State, 698 N.E.2d 1146, 1148–49 (Ind. 1998)).

The constitutionality of a search or seizure is a question of law, and we review it de novo. Campos v. State, 885 N.E.2d 590, 596 (Ind. 2008) (citing Myers v. State, 839 N.E.2d 1146, 1150 (Ind. 2005)). On any disputed issue of fact, we defer to the trial court's finding unless it is clearly erroneous; we will not reweigh the evidence. Id. (citing State v. Quirk, 842 N.E.2d 334, 340 (Ind. 2006)).

The admission of evidence, including the defendant's own statement, is a matter entrusted to the trial court's sound discretion. Schmitt v. State, 730 N.E.2d 147, 148 (Ind. 2000). We will reverse only if we find the decision below "clearly against the logic and effect of the facts and circumstances." Joyner v. State, 678 N.E.2d 386, 390 (Ind. 1997).

## The Warrantless Seizure of Kelly's Person and Search of Her Vehicle Violated Her Constitutional Rights.

Kelly argues the seizure of her person and the search of her vehicle, both warrantless, violated the rights secured to her by the Fourth Amendment to our federal Constitution. The

Fourth Amendment guarantees that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, warrantless searches "are per se unreasonable under the Fourth Amendment, subject to a 'few specifically established and well-delineated exceptions.'" Holder, 847 N.E.2d at 935 (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). When a defendant challenges a warrantless search, the burden is on the State to prove the search fell within one of those exceptions. Id. (citing White v. State, 772 N.E.2d 408, 411 (Ind. 2002)).

Two such exceptions are relevant here. First, an officer may "stop and briefly detain a person for investigative purposes," Armfield v. State, 918 N.E.2d 316, 319 (Ind. 2009) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)), so long as he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). A Terry stop, thus, is permissible without a warrant or probable cause if the officer has reasonable suspicion to justify the stop. Armfield, 918 N.E.2d at 319. Second, an officer may arrest a person if he has probable cause— meaning "knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question." Peterson v. State, 674 N.E.2d 528, 536 (Ind. 1996) (quoting Bergfeld v. State, 531 N.E.2d 486, 490 (Ind. 1988)). Therefore, we must determine whether the police merely conducted a Terry stop or actually arrested Kelly.

The line between a Terry stop and a full-blown custodial arrest is blurred by the tension and uncertainty inherent in such encounters. Jones v. State, 655 N.E.2d 49, 55 (Ind. 1995). As in other areas of the law that do not rest comfortably within bright lines, we apply a "reasonableness" test: would a reasonable person, in the same situation as the defendant, believe she was free to leave? Id. The typical Terry stop is a "a relatively brief encounter." Wilson v. State, 745 N.E.2d 789, 791 (Ind. 2001) (quoting Knowles v. Iowa, 525 U.S. 113, 117 (1998)). An arrest, in contrast, is "the taking of a person *into custody*, that he may be held to answer for a

8

crime." Ind. Code § 35-33-1-5 (2008) (emphasis added). And we have said before that "an arrest occurs when a police officer interrupts the freedom of the accused and restricts his liberty of movement." Sears v. State, 668 N.E.2d 662, 667 (Ind. 1996) (finding arrest when defendant was handcuffed and placed in patrol car).

Here, two officers ordered Kelly out of her car at gunpoint and handcuffed her. They then proceeded to search her car and subject her to questioning. And when she asked if she could leave, Chief Kiphart told her to sit down "before [he] put [her] down." Indeed, Chief Kiphart testified he considered Kelly to be "in custody" the moment he cuffed her. Tr. at 20–21. We believe these circumstances, taken together, constitute an arrest that must be supported by probable cause. Accord Reinhart v. State, 930 N.E.2d 42, 47 (Ind. Ct. App. 2010) (finding encounter constituted arrest when officer approached defendant with his gun drawn, ordered him to lie on the ground, and handcuffed him).

The existence of probable cause is a fact-sensitive determination, and the officer's knowledge may be based on reliable information he receives from an informant. DiTommaso v. State, 566 N.E.2d 538, 540 (Ind. 1991). The reliability of such information depends upon many factors, including whether (1) the informant has provided accurate information before, (2) the criminal allegations are corroborated by independent facts, (3) there is a demonstrated basis for the informant's knowledge, (4) the informant correctly predicts the suspect's otherwise unpredictable conduct or activity, and (5) the informant has made a declaration against her own penal interest. State v. Spillers, 847 N.E.2d 949, 954 (Ind. 2006); see also Jaggers v. State, 687 N.E.2d 180, 182 (Ind. 1997) (finding no probable cause when the "critical claim" of criminal activity "was entirely uncorroborated"); Houser v. State, 678 N.E.2d 95, 100 (Ind. 1997) (adding the fifth factor, declaration against penal interest).

At the suppression hearing, Sergeant Fuller testified he had never used Goodwin as an informant before and had no way to assess her trustworthiness. Prior to the arrest, the officers corroborated that Day had arrived as Goodwin said he would, but they did not corroborate the "critical claim" that he had cocaine and intended to sell it. Indeed, the officers had no other

evidence—aside from Goodwin's statements—to believe *Day* was doing anything illegal. And Goodwin said nothing about *Kelly* at all. Finally, the State argues Goodwin's statements were credible because she could have been prosecuted for making a false report if she had lied, or for attempted cocaine possession if the police believed she was actually buying drugs from Day rather than setting a trap for him. But as we have said before, susceptibility to prosecution for false reporting—or, similarly, for participation in the criminal enterprise—is a relevant factor in our analysis but is not enough on its own to infuse Goodwin's statements with reliability sufficient to support a finding of probable cause. See Kellems v. State, 842 N.E.2d 352, 355 (Ind. 2006), modified on reh'g 849 N.E.2d 1110 (Ind. 2006).

All of these circumstances, in the aggregate, likely would have been enough to establish reasonable suspicion for a Terry stop, but that question is not before us today. What we can say is, on these facts, the officers did not have probable cause to arrest Kelly or to search her vehicle.[3] And as we have found her federal constitutional claim dispositive of this issue, we do not address her separate claim that the search and seizure violated rights guaranteed to her by article 1, § 11 of our Indiana Constitution.

---

[3] As we have said before, "the exclusionary rule is designed to deter police misconduct." Spillers, 847 N.E.2d at 957 (quoting Hensley v. State, 778 N.E.2d 484, 489 (Ind. Ct. App. 2002)). Here, police arrested Kelly without probable cause, and thus the evidence obtained as a result of that arrest must be suppressed. But we emphasize that our analysis of whether an arrest has occurred is based on the totality of the circumstances. In this case, that "totality" comprises the stop at gunpoint, the cuffing, the search of the car, the tone and scope of the interrogation, and the refusal to allow Kelly to leave when she asked to do so. Viewed in isolation, one or more of these actions may have been a justified response to officers' reasonable safety concerns. We have never held such a response to be misconduct. Clark v. State, 994 N.E.2d 252, 263 n.13 (Ind. 2013) ("We emphasize that we are not disparaging [the officer's] professional assessment of the precautions he believed necessary."); see also Terry, 392 U.S. at 33 (Harlan, J., concurring) ("There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."). Nor do we so hold today, and our opinion should not be taken to suggest that police officers must sacrifice their personal security on an altar to the Fourth Amendment.

**Siebert Prohibits the Admission of Kelly's Statements to Chief Kiphart.**

Kelly argues her statements to Chief Kiphart were obtained involuntarily and should have been suppressed under the rule articulated by the Supreme Court of the United States in Missouri v. Seibert, 542 U.S. 600, 617 (2004) (plurality opinion). The State concedes the statements Kelly made before Chief Kiphart read her the Miranda warning should be suppressed, but it contends that her post-Miranda statements are admissible under Oregon v. Elstad, 470 U.S. 298, 318 (1985) and that Seibert is inapposite here.

As a threshold matter, we note that although we have found Kelly's arrest was unlawful, that conclusion does not necessarily render her subsequent inculpatory statements inadmissible. The State may still use her statements against her if it can shoulder the burden to show that those statements were not "obtained by exploitation of an illegal arrest." Dunaway v. New York, 442 U.S. 200, 218 (1979). Our federal colleagues have identified three factors particularly relevant to this inquiry: "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603–04 (1975) (footnote and internal citation omitted). But we need not tilt at that particular windmill today. Assuming without deciding that Kelly's post-Miranda statements survive the illegal arrest, we nonetheless find they are a product of the "question-first" interrogation practice disapproved of in Siebert and therefore inadmissible.

The Fifth Amendment, incorporated to the states via the Fourteenth Amendment, guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 8 (1964). Before a law enforcement officer may subject someone to custodial interrogation, the officer must advise him "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). If the officer does not so advise the subject, the prosecutor cannot use any statements the subject does make against him in court. Id. As so

11

expressed, the rule is clear. But what result if police conduct a custodial interrogation, elicit an incriminating statement, and only then provide the subject with a Miranda warning, after which the subject makes a second incriminating statement? The federal Supreme Court has made two pronouncements on that question that guide us to the result we reach today.

In Elstad, police officers went to the defendant's home with a warrant for his arrest and spoke to him in his living room, where he admitted he was present at a recent burglary. Elstad 470 U.S. at 300–01. The officers then took the defendant back to the stationhouse, where they read him his Miranda rights. Id. at 301. The defendant waived those rights and proceeded to make a full confession, but his trial counsel moved to suppress it, arguing it was "fruit of the poisonous tree"—the tree being the defendant's initial, unwarned, inculpatory statement. Id. at 301–02. The Court disagreed, holding "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318.

Nearly twenty years later, however, the Court considered a similar situation and reached a different conclusion. In Siebert, police arrested the defendant, intentionally refrained from giving her a Miranda warning, and aggressively interrogated her for over half an hour. Siebert, 542 U.S. at 604–05. Only when she admitted she had helped plan a murder by arson did the officer turn on a tape recorder, read her Miranda rights, and obtain a signed waiver. Id. at 605. When he resumed the interrogation, he began by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" and proceeded to confront the defendant with her previous statements: "Now, in discussion you told us, you told us that there was a[n] understanding. . ." Id. Later, when the defendant was not forthcoming with information, the officer prodded her with her pre-warning statement: "didn't you tell me that [the victim] was supposed to die in his sleep?" Id. The defendant then repeated her earlier admission and signed a confession. Id.

At the hearing on the defendant's motion to suppress her confession, the officer testified he acted in conformity with his interrogation training, in which he learned to "question first, then

12

give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" Id. at 606 (quoting the officer's testimony). He also admitted the defendant's post-warning statement was generally repetitive of her pre-warning statement. Id. In light of the particular circumstances of the case, a four-Justice plurality concluded the statement must be suppressed, reasoning "when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 613–14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)). As for the State's argument that Elstad should control, the plurality noted the facts of that case were clearly distinguishable:

> The contrast between Elstad and this case reveals a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 615.

We have considered this case in light of those five factors and find it closer to Seibert than to Elstad. Kelly's pre-warning statement regarding the cocaine ("I did know about it") was more specific than her post-warning statement (Chief Kiphart stated "You knew he had the cocaine," and Kelly simply responded "Yeah."). Both statements concern the same subject: whether Kelly knew Day had cocaine. They were made in the same location, mere minutes apart, in response to the same officer. Most significantly, however, Chief Kiphart and another officer referred to Kelly's pre-warning admission three times during the post-warning interrogation. First, immediately after Chief Kiphart read Kelly the Miranda warning, Kelly denied dealing cocaine, and Chief Kiphart reminded her she knew Day had cocaine: "You said. You told me." Then, when Kelly denied knowing why Day needed a ride, Chief Kiphart replied: "Oh. That's not what you told me, like, thirty seconds ago." Finally, another officer chimed in:

13

"You just told us you did."  Such references, we believe, inevitably diluted the potency of the Miranda warning such that it was powerless to cure the initial failure to warn, even if that failure was a product of good-faith mistake.  These circumstances lead us to conclude, as the Seibert Court did, "that a reasonable person in the suspect's shoes would not have understood [the Miranda warning] to convey a message that she retained a choice about continuing to talk."  Id. at 617.

Our conclusion today is consistent with several previous decisions from our Court of Appeals.  See, e.g., Morris v. State, 871 N.E.2d 1011, 1019 (Ind. Ct. App. 2007), trans. denied; Payne v. State, 854 N.E.2d 7, 16 (Ind. Ct. App. 2006); King v. State, 844 N.E.2d 92, 99 (Ind. Ct. App. 2005); Drummond v. State, 831 N.E.2d 781, 784 (Ind. Ct. App. 2005) (all applying Seibert to preclude the admission of confessions obtained through "question first, warn later" interrogation).  Although we have no knowledge of, and thus can express no opinion regarding, Chief Kiphart's motives, we believe our jurisprudence, as well as that of our colleagues, makes it clear that Miranda requires a "warn-first practice."  Seibert, 542 U.S. at 615.  This does not mean that officers must offer a Miranda warning prior to initiating any conversation with a suspect, nor does it mean that a pre-warning confession necessarily renders a post-warning confession involuntary.  Officers may still, under Elstad, cure a good-faith mistake by administering a proper warning before proceeding with further questioning.  All we hold today is that such a cure was impossible when it was followed by explicit references to a pre-warning incriminating statement.  Finally, as we have found Kelly's post-warning statements inadmissible under the federal Fifth Amendment, we need not address Kelly's claim that they are also inadmissible under article 1, § 14 of our own Indiana Constitution.

**Conclusion**

We therefore reverse the trial court's denial of Kelly's motion to suppress and remand for further proceedings consistent with our opinion today.

Dickson, C.J., Rucker, David, and Rush, JJ., concur.

14