## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 29 2020, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald J. Moore
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Gary Lee Voiles, Jr.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 29, 2020

Court of Appeals Case No.
20A-CR-267

Appeal from the Wayne Circuit Court

The Honorable David A. Kolger, Judge

Trial Court Cause No.
89C01-1805-F2-8

**Tavitas, Judge.**

# Case Summary

In this interlocutory appeal, Gary Voiles appeals the trial court's order denying his motion to suppress evidence seized as a result of an encounter with law enforcement. We affirm.

# Issue

Voiles raises one issue for our review, which we revise and restate as whether the trial court erred by denying Voiles' motion to suppress evidence.

# Facts

On April 27, 2018, Captain William Shake with the City of Richmond Police Department was parked in Richmond and observed two males pass by in a vehicle. The driver of the passing vehicle was a white male with "dark hair and a beard" and "tattoos on his right arm." Tr. Vol. II p. 9. Captain Shake believed the driver to be Christopher Eliton, whom Captain Shake knew to be a habitual traffic offender with a suspended driver's license. Captain Shake had seen Eliton two weeks earlier, and Eliton also had dark hair, a dark beard, and tattoos on his right arm. Captain Shake knew that Eliton "had been arrested in February 2018 . . . for a controlled substance violation." *Id.*

Captain Shake began following the vehicle. Captain Shake radioed Officer Tyler Smith, who was patrolling with Officer Julia Shank, to assist in identifying Eliton because Captain Shake was unable to identify Eliton on his own. Captain Shake followed the vehicle for approximately "[a] minute to a minute and a half." *Id.* at 20. The vehicle pulled into a car wash parking lot,

and Captain Shake pulled in behind the vehicle and activated his emergency lights. Captain Shake did not run the vehicle's license plate information to determine the vehicle's owner prior to approaching the vehicle. The driver did not commit any traffic infractions during the time Captain Shake was observing the vehicle.

[5] At 10:48 p.m., Captain Shake exited his marked police vehicle and approached Carico's vehicle. Captain Shake ordered the driver to throw the keys out of the vehicle to prevent a pursuit. Captain Shake approached the vehicle and asked the two men for their names. At approximately the same time, Officers Smith and Shank also arrived on the scene. Officer Smith looked inside the vehicle at the driver to determine whether Eliton was the driver. The driver identified himself as John Carico,[1] and the passenger identified himself as Voiles.

[6] The officers asked the men for identification; Carico did not "have any identity or ID cards with him", and Voiles produced his prison identification card. *Id.* at 26. Captain Shake returned to his vehicle to run both names through dispatch and to obtain a photograph of Carico to confirm his identity. As Captain Shake walked back to his vehicle, Officer Smith told Captain Shake that the driver was not Eliton.

---

[1] The transcript spells Carico's last name as "Carrico." Tr. Vol. II p. 11. Captain Shake's police report, which was admitted into evidence, spells Carico's last name as "Carico"; therefore, we will use this spelling for consistency. Ex. Vol. I p. 3.

[7]     While Captain Shake was running the names, Officer Smith again approached Captain Shake and reported that Voiles "was fidgeting around a lot with his hands," and was "eating . . . hard candies, . . . multiple of them, rapidly." *Id.* at 41. Officer Smith also observed Voiles light a cigarette, and Voiles was visibly shaking. Officer Smith believed that Voiles was lighting a cigarette because he was nervous and to mask any odors that may be in the air. Captain Shake called for a canine officer to conduct an open air sniff. Captain Shake learned from dispatch that Carico had a suspended license, and Captain Shake began writing a citation for Carico.

[8]     The canine officer arrived at 10:57 p.m. and conducted an open air sniff while Captain Shake was still writing Carico's citation. Carico and Voiles remained inside the vehicle during the open air sniff, and the canine officer alerted to the presence of illegal substances. Officer Smith asked Voiles to step out of the vehicle and asked Voiles if he had any weapons on his person. Voiles indicated that he possibly had a pocketknife or a box cutter in his pocket. Officer Smith conducted a pat down of Voiles' person and felt an object in the coin pocket of Voiles' pants that Officer Smith believed to be illegal substances. Officer Smith removed a "really tightly packaged plastic baggie of powdered substance," which Officer Smith believed to be heroin. *Id.* at 44. Voiles was then taken into custody. Officers found multiple empty plastic baggies in the passenger door of Carico's vehicle, which officers believed to be associated with drug use, as well as a digital scale near the passenger seat.

[9]     The officers did not find contraband on Carico's person, and Captain Shake issued Carico a citation for driving with a suspended driver's license. Voiles was taken to the jail and strip searched, and officers found multiple bags of heroin and methamphetamine concealed on Voiles' person.

[10]    On May 1, 2018, the State charged Voiles with Count I, dealing in methamphetamine, a Level 2 felony; and Count II, dealing in a narcotic drug, a Level 4 felony. The State separately filed an information alleging Voiles was a habitual offender.

[11]    On November 26, 2018, Voiles filed a motion to suppress evidence, arguing that his seizure violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Voiles argued that evidence discovered on Voiles' person should be suppressed because continuing the investigatory stop after the officers discovered Carico was not Eliton was unreasonable under *Holly v. State*, 918 N.E.2d 323 (Ind. 2009). The trial court held a suppression hearing on April 8, 2019. After the suppression hearing and additional briefing by the parties, the trial court entered an order on May 13, 2019, denying Voiles' motion to suppress evidence.

[12]    Voiles filed his first motion to certify the trial court's order for interlocutory appeal, which the trial court denied on June 3, 2019. Voiles renewed his motion on December 27, 2019, which the trial court granted. The trial court certified its order denying Voiles' motion to suppress evidence for interlocutory

appeal on January 9, 2020.  On February 26, 2020, our Court accepted the interlocutory appeal.

## Analysis

[13]    Voiles argues his rights under the Fourth Amendment of the United States Constitution[2] were violated during the stop; and, therefore, the trial court erred by denying his motion to suppress evidence discovered on his person during the stop.  "When a trial court denies a motion to suppress evidence, we necessarily review that decision 'deferentially, construing conflicting evidence in the light most favorable to the ruling.'"  *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019) (quoting *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014)), *cert. denied*, 140 S. Ct. 113 (2019).  We, however, consider any substantial and uncontested evidence favorable to the defendant.  *Id.*  We review the trial court's factual findings for clear error, and we decline invitations to reweigh evidence or judge witness credibility.  *Id.*  "If the trial court's decision denying 'a defendant's motion to suppress concerns the constitutionality of a search or seizure,' then it presents a legal question that we review de novo."  *Id.* (quoting *Robinson*, 5 N.E.3d at 365).

---

[2] In his brief, Voiles references Article 1, Section 11 of the Indiana Constitution; however, Voiles does not articulate a separate argument under the Indiana Constitution.  Accordingly, his claim under the Indiana Constitution is waived.  *See Abel v. State,* 773 N.E.2d 276, 278 n.1 (Ind. 2002) ("Because Abel presents no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived.").

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. U.S. Const. amend. IV. "The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006). This protection has been "extended to the states through the Fourteenth Amendment." *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). "As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013).

Under *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968), an officer may "stop and briefly detain a person for investigative purposes," so long as he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013) (internal citations omitted). "A *Terry* stop, thus, is permissible without a warrant or probable cause if the officer has reasonable suspicion to justify the stop." *Id.*

"Reasonable suspicion to justify an investigative stop must be based on specific and articulable facts known to the officer at the time of the stop that lead the officer to believe that criminal activity may be afoot." *Finger v. State,* 799 N.E.2d 528, 533 (Ind. 2003) (quotations omitted). "Reasonable suspicion

requires more than mere hunches or unparticularized suspicions." *Id.* "An officer must be able to point to specific facts giving rise to reasonable suspicion of criminal activity." *Id.* The standard does not, however, "require absolutely certainty of illegal activity." *Rutledge v. State,* 28 N.E.3d 281, 290 (Ind. Ct. App. 2015).

[17] Voiles argues that Captain Shake did not have reasonable suspicion to conduct an investigatory stop and, even if Captain Shake had reasonable suspicion to conduct the investigatory stop, Captain Shake had no reasonable suspicion to extend the stop after asking for the driver's name and discovering that the driver was not Eliton. Voiles argues, in part, that our Supreme Court's opinion in *Holly v. State,* 918 N.E.2d 323 (Ind. 2009)*,* and this Court's opinion in *Johnson v. State,* 21 N.E.3d 841 (Ind. Ct. App. 2014), *trans. denied*, require a conclusion that Captain Shake did not have reasonable suspicion to conduct or extend the investigatory stop.

[18] In *Holly v. State,* 918 N.E.2d 323 (Ind. 2009)*,* law enforcement ran a routine license plate check of a vehicle while the vehicle was traveling on a street in Indianapolis. The check revealed the vehicle was registered to a woman named Terry Sumler, who had a suspended driver's license. Law enforcement conducted a traffic stop to identify the driver of the vehicle. When the officer approached the vehicle, officers discovered that the male driver was Holly, and Sumler was one of the passengers in the vehicle. The officer asked Holly for a driver's license, which Holly did not have; however, Holly and the other passengers provided the officer with identifying information. After running the

information, the officer discovered that Holly's driver's license was also suspended. The officer ordered Holly and the passengers out of the vehicle and conducted a search of the vehicle. The search yielded marijuana in the vehicle, and Holly admitted the marijuana belonged to him.

The State charged Holly with possession of marijuana, a Class A misdemeanor, and a bench trial was held. At the bench trial, Holly moved to suppress the evidence arguing that "the officers lacked reasonable suspicion to search the vehicle after discovering that the driver was not the registered owner." *Holly,* 918 N.E.2d at 324. The trial court denied Holly's motion to suppress evidence. Our Supreme Court held that the officer had reasonable suspicion under the Fourth Amendment to initiate the investigatory *Terry* stop because the officer was unable to observe the driver before initiating the stop.

Our Supreme Court, however, went on to address the "stubbornly clear" fact that, before the officer asked Holly to produce his driver's license, the officer "knew that Holly was not the owner of the vehicle." *Holly,* 918 N.E.2d at 326. Our Supreme Court went on to conclude that:

> It is of no import that Officer Ross had already initiated a lawful stop before he first observed the driver. Reasonable suspicion to pull a car over does not confer unconditional authority to request the driver's license and registration. . . . In sum there is simply nothing in this record justifying any further inquiry subsequent to the valid *Terry* stop.

*Id.* at 326.

[21] Our Court then applied our Supreme Court's analytical framework in *Johnson v. State*, 21 N.E.3d 841 (Ind. Ct. App. 2014), *trans. denied*. There, law enforcement was following a vehicle, ran a routine license plate check, and discovered the vehicle was registered to Ashley Boyd, who had a suspended driver's license. After following the vehicle for about two miles and observing no traffic violations, officers initiated a traffic stop. The officer approached the vehicle and discovered Johnson, a male, was the driver. Boyd was a passenger in the vehicle, and she acknowledged that it was her vehicle and that her driver's license was suspended. Still, the officer asked Johnson for his identification "because he wanted to confirm that the driver was not Ashley Boyd." *Johnson*, 21 N.E.3d at 843. The officers discovered that Johnson's driver's license was also suspended, and Johnson was charged with driving while suspended, a Class A misdemeanor. The trial court denied Johnson's motion to suppress evidence as violative of Johnson's Fourth Amendment rights, and our Court reversed.

[22] Johnson "[did] not challenge the validity of Deputy Wendel's initial investigatory stop [in light of *Armfield*]. Rather, Johnson contend[ed] that, after passenger Boyd identified herself as the vehicle's owner, Deputy Wendel became aware" that Boyd was not the driver. *Id.* at 844-45. Therefore, "Deputy Wendel should have ended the traffic stop" in light of *Holly*. *Id.* at 845. Our Court found that, "[b]y [the officer's] own testimony, he had no reason to disbelieve Boyd's statement. In other words, he no longer had reasonable suspicion that Boyd was driving while suspended." *Id.* at 845.

Therefore, our Court concluded that, "[o]nce Boyd identified herself and Deputy Wendel had no reason to disbelieve her, the deputy had no reasonable suspicion to ask Johnson for his license or otherwise extend the stop." *Id.* at 846. Our Court also stated that: "To the extent that Deputy Wendel may have felt he needed to confirm Boyd's truthful statement as to *her* identity, we fail to see how his request to see *Johnson's* driver's license could possibly confirm it." *Id.*

[23] Here, Captain Shake conducted the investigatory stop because he believed Carico to be Eliton, whom Captain Shake knew to be a habitual traffic offender with a suspended driver's license. Carico and Eliton both were white males with dark hair, a beard, and tattoos on their right arms. Captain Shake did not run the license plate information prior to approaching the vehicle to determine the vehicle's owner. Captain Shake, however, contacted Officer Smith to help identify Eliton. Although Captain Shake was not completely certain of the driver's identity when he initiated the investigatory stop, reasonable suspicion under the Fourth Amendment does not require complete certainty. *See Rutledge,* 28 N.E.3d at 290; *see also Jones v. State,* 101 N.E.3d 249, 255 (Ind. Ct. App. 2018) (finding sufficient evidence of reasonable suspicion when law enforcement stopped the defendant who was travelling with a passenger who matched the physical description of a wanted felon with multiple warrants), *trans. denied*.

[24] The State properly notes that "[i]t is of no consequence that the driver was not, in fact, Eliton" because, "[e]ven if a court ultimately finds that no violation of a

traffic law occurred, an officer does not violate the Fourth Amendment so long as reasonable suspicion existed at the time of the stop." Appellee's Br. p. 11 (citing *Sanders v. State*, 989 N.E.2d 332, 335-36 (Ind. 2013)). Accordingly, we conclude that, based on Captain Shake's belief that the driver was Eliton, who was a habitual traffic violator with a suspended driver's license, Captain Shake had knowledge of specific and articulable facts that led Captain Shake "to believe that criminal activity may be afoot." *Finger*, 799 N.E.2d at 533. Thus, Captain Shake had reasonable suspicion to conduct an investigatory stop of Carico's vehicle.

[25] Next, Voiles contends that, even if Captain Shake had reasonable suspicion to conduct the investigatory stop, Captain Shake no longer had reasonable suspicion, pursuant to *Holly* and *Johnson*, after the driver identified himself as Carico. In both *Holly* and *Johnson*, it was readily apparent when the officers approached the vehicles that the male drivers of the vehicles were not the female owners of the vehicles with suspended driver's licenses. Here, when Captain Shake approached Carico's vehicle, it was not immediately apparent to Captain Shake that Carico was not Eliton, and Captain Shake asked for the driver's identification. Accordingly, we do not find *Holly* and *Johnson* controlling here.

[26] Although Carico identified himself, Carico did not have his driver's license in his possession. Indiana Code Section 9-24-13-39(a) requires a driver to have his driver's license in his "immediate possession when driving or operating a motor vehicle." Under Indiana Code Section 9-24-13-5, a person who violates

Indiana Code Section 9-24-13-3 commits a Class C infraction. Accordingly, once Carico failed to present his driver's license, Captain Shake had probable cause to believe that Carico committed an infraction. It is well settled that an officer may detain a person that has committed an infraction. *See* Ind. Code § 34-28-5-3(a).[3] Although Captain Shake soon discovered that Carico was not Eliton, Captain Shake already was aware of an infraction at that point and could detain Carico.

[27] Captain Shake then ran Carico's information and learned that Carico's driver's license was suspended. As Captain Shake was writing the citation, the canine officer arrived and conducted an open air sniff of the vehicle. The canine officer alerted to the presence of illegal substances, resulting in Voiles' arrest. Voiles makes no argument with respect to the canine sniff.[4] The trial court properly denied Voiles' motion to suppress evidence discovered as a result of the investigatory stop.

---

[3] Indiana Code Section 34-28-5-3(a) provides:

> Whenever a law enforcement officer believes in good faith that a person has committed an infraction or ordinance violation, the law enforcement officer may detain that person for a time sufficient to:
>
> (1) inform the person of the allegation;
>
> (2) obtain the person's:
>
>   (A) name, address, and date of birth; or
>
>   (B) driver's license, if in the person's possession; and
>
> (3) allow the person to execute a notice to appear.

[4] Voiles also makes no argument regarding the search of his person after the canine sniff. Accordingly, we do not address the search of his person.

# Conclusion

[28] Based on the foregoing, we find that the trial court properly denied Voiles' motion to suppress evidence. Accordingly, we affirm.

[29] Affirmed.

Kirsch, J., and Pyle, J., concur.