

FILED
Apr 27 2016, 8:13 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Andrew Shotts,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 27, 2016

Court of Appeals Case No.
49A04-1509-CR-1347

Appeal from the Marion Superior
Court

The Honorable David Seiter,
Commissioner

Trial Court Cause No.
49G20-1404-FB-17437

**Baker, Judge.**

[1] Andrew Shotts appeals his conviction and sentence for Unlawful Possession of a Firearm by a Serious Violent Felon,[1] a Class B Felony. Shotts argues that he was seized in violation of the Fourth Amendment to the United States Constitution and that evidence obtained as a result of this seizure should not have been admitted at trial. Finding that Shotts's seizure was authorized pursuant to the United States Supreme Court's decision in *Michigan v. Summers*, 452 U.S. 692 (1981), we find no error in the trial court's refusal to exclude evidence obtained as a result of the seizure. We also find that the trial court did not err in sentencing Shotts and that his sentence is not inappropriate. Accordingly, we affirm the trial court and remand for the limited purpose of vacating Shotts's conviction and sentence for Visiting a Common Nuisance,[2] a Class B misdemeanor, as the charge had been dismissed before trial.

## Facts[3]

[2] On April 4, 2014, officers of the Indianapolis Metropolitan Police Department (IMPD) executed a search warrant for a house located at 913 North LaSalle Street in Marion County. The warrant authorized the search and seizure of heroin, as well as evidence related to drug trafficking, and the arrest of a man by

---

[1] Ind. Code § 35-47-4-5.

[2] Ind. Code § 35-48-4-13.

[3] We held oral argument in this case on March 22, 2016, in Indianapolis. We would like to thank both parties for their exceptional oral advocacy.

the name of Joshua Summers. In executing the search, IMPD officers were initially joined by members of the IMPD SWAT team.

[3] Upon entering the house, the officers found seven people and a dog. The officers handcuffed the seven individuals and took them to the downstairs dining room. Several officers were assigned to get basic information from the detainees, while others conducted the search. The SWAT team then left to respond to a shooting that had occurred nearby. The remaining officers interviewed the detainees and conducted a search of the house, eventually finding heroin, cocaine, suboxone, and drug paraphernalia.

[4] While the search was ongoing, one of the detectives, Detective Kessey, looked out of the window and noticed a car pull up and park in front of the residence. He then watched an individual, later identified as Andrew Shotts, get out of the car and approach the residence.[4] Detective Kessey alerted the officers downstairs that Shotts was approaching.

[5] Officer Hemphill was downstairs when he heard Detective Kessey's warning. He looked outside and saw Shotts entering the house's enclosed front porch area. Officer Hemphill—who was wearing plain clothes, a black mask, and a black tactical vest that displayed the word "Police" in large letters—asked Shotts what he was doing and told him to "stop right there." Tr. p. 34. Shotts

---

[4] It is not clear from the record whether an individual approaching the residence would have had reason to believe that a search was being conducted inside.

stated that he was there to see his friend and continued walking into the front porch area. Officer Hemphill noticed that Shotts had his right hand in his pocket and ordered Shotts to remove it. Shotts did not do so and continued to walk towards the front door, again stating that he was there to see his friend. Shotts passed through the front door and entered the house. Officer Hemphill again told him to stop, but Shotts continued to move forward, peering around Officer Hemphill so that he could look into the dining room.

[6] At this point, Officer Hemphill drew his gun. Shotts stopped and again stated that he was there to see his friend. Officer Hemphill ordered Shotts to remove his hand from his pocket. Shotts complied, putting both of his hands in the air. Officer Hemphill grabbed Shotts's right arm and Shotts attempted to pull away. Officer Hemphill then spun Shotts down onto a couch and handcuffed him. He asked Shotts what was in his pocket, and Shotts replied "my gun." Tr. p. 28. Officer Hemphill then patted Shotts down and found a purple handgun.

[7] Shotts was arrested and charged with class B felony unlawful possession of a firearm by a serious violent felon and class B misdemeanor visiting a common nuisance. Shotts filed a motion to suppress evidence found on his person, arguing that he had been "detained, arrested, and searched unlawfully and without a warrant or probable cause." Appellant's App. p. 63. On July 22, 2015, the trial court held a simultaneous suppression hearing and bench trial. At the start of proceedings, the State moved to dismiss the visiting a common nuisance charge and the trial court granted the motion. Tr. p. 4. The court

then denied Shotts's suppression motion, noting that Shotts had ignored Officer Hemphill's initial orders to stop. It concluded that because

> [t]he defendant kept advancing into the house[,] [t]he court finds under the totality of the circumstances, it was reasonable [to] conduct [a] pat down of the defendant, based on the factors reiterated by the officers during the testimony, and that the pat down resulted in the lawful recovery of the firearm.

Tr. p. 44. The trial court then found Shotts guilty of unlawful possession of a firearm by a serious violent felon.

[8] On August 18, 2015, the trial court sentenced Shotts to eighteen years, with twelve years executed at the Department of Correction, two years executed at Community Corrections, and four years suspended. The trial court also sentenced Shotts to 180 days, to run concurrently with his other sentence, for visiting a common nuisance, despite the fact the State had moved to dismiss this charge and Shotts had not been convicted of it.[5] Shotts now appeals.

# Discussion and Decision

[9] On appeal, Shotts raises several issues related to his seizure, as well as to the propriety of his sentence. As to the seizure, he argues that the handgun found on his person should have been suppressed because he was seized in violation

---

[5] Both parties acknowledge that this was error. Appellee's Br. p. 16.

of the Fourth Amendment to the United States Constitution.[6] As to his sentence, he argues that the trial court erred in considering his risk assessment score as an independent aggravator and in failing to exclude his 2009 robbery conviction from its consideration, as this conviction was itself an element of the offense of possession of a firearm by a serious violent felon. He also argues that his sentence is inappropriate in light of the nature of the offense and his character.

## I. Suppression of the Handgun

[10] Shotts first argues that the trial court erred in admitting the handgun into evidence because it was discovered as the result of an unconstitutional seizure. The decision to admit or exclude evidence lies within the discretion of the trial court. *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). Accordingly, we review a trial court's denial of a motion to suppress evidence deferentially, construing conflicting evidence in the light most favorable to the ruling. *Id.* However, "[w]hen the trial court's denial of a defendant's motion to suppress concerns the constitutionality of a search or seizure . . . it presents a question of law, and we address that question de novo." *Id.*

[11] The Fourth Amendment to the United States Constitution provides that

> The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no

---

[6] Shotts makes no argument with regard to the Indiana Constitution.

> Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized.

The U.S. Supreme Court has recognized a "'general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause' to believe that the individual has committed a crime." *Bailey v. United States*, 133 S.Ct. 1031, 1037 (2013) (quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979)). While the Supreme Court has found exceptions to this general rule, it has been clear that these exceptions are to remain narrow in scope. *Dunaway*, 442 U.S. at 211; *Bailey,* 133 S.Ct. at 1044 (Scalia J., concurring). The State bears the burden of demonstrating that a seizure conducted without probable cause falls within one of the exceptions. *See Taylor v. State*, 659 N.E.2d 535, 537 (Ind. 1995).

[12] The State relies on two exceptions to the probable cause requirement, one identified in *Terry v. Ohio*, 392 U.S. 1 (1968), which relates to a brief stop and frisk for weapons, and another identified in *Michigan v. Summers*, 452 U.S. 692 (1981), which relates to the execution of a search warrant. We believe that *Summers* should control our decision in this case.[7] However, before we delve into our discussion of *Summers*, we find it necessary to discuss some difficulties we have with portions of the State's argument under *Terry*.

---

[7] For this reason we do not address the State's argument that the officers had probable cause to arrest Shotts.

# A. *Terry* Stop

The State asserts that it was reasonable for the officers to detain Shotts and that "[t]hat answer is derived from standards put forth by the Supreme Court of the United States . . . ." Appellee's Br. p. 18. The argument that follows makes numerous citations to cases that rely on both *Terry* and *Summers*. *Id.* at 18-26. Although the State does not conduct a proper *Terry* analysis, its argument seems to rely on *Terry*'s reasoning to some extent, and, given that the trial court seemed to rely on *Terry* as well, tr. p. 44, we will briefly address it.

Under *Terry*, an officer is permitted to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Because *Terry* allows for seizures on less than probable cause, the degree of intrusion caused by the seizure must be circumscribed. *Kolender v. Lawson*, 461 N.E.2d 352, 364-65 (1983) (Brennan J., concurring). Thus, while *Terry* allows for a brief investigatory stop, it does not allow for a formal arrest. *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013).

While distinguishing between an investigatory stop and an arrest presents the greatest difficulty in applying *Terry* to the facts of this case, the State fails to address the issue. This distinction is critical, however, as *Terry* does not allow us to conclude that it was reasonable for the officers *to arrest* Shotts on less than probable cause.

[16]     As the United States Supreme Court has acknowledged, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* But "[n]either Federal nor Indiana constitutional jurisprudence has developed a 'bright line' test for determining when an investigatory detention moves beyond merely a *Terry* stop and becomes an arrest . . . ." *Jones v. State*, 655 N.E.2d 49, 55 (Ind. 1995). Courts of this State have reached varied conclusions based on the unique facts presented by different scenarios. *See Kelly*, 997 N.E.2d at 1051 (defendant ordered out of car at gunpoint and handcuffed was under arrest for Fourth Amendment purposes); *Wright v. State*, 766 N.E.2d 1223, 1230-34 (Ind. Ct. App. 2002) (defendant ordered out of car, handcuffed, but told he was not under arrest, was not under arrest for Fourth Amendment purposes, but was "in custody" for Fifth Amendment purposes).[8]

---

[8] Our Supreme Court stated in *Kelly* that the test used to distinguish a *Terry* stop from a formal arrest is: "would a reasonable person, in the same situation as the defendant, believe she was free to leave?" 997 N.E.2d at 1051; *see also Sears v. State*, 668 N.E.2d 662, 667 (Ind. 1996) ("It has long been held that an arrest occurs when a police officer interrupts the freedom o[f] the accused an[d] restricts his liberty of movement."); *Peterson v. State*, 234 N.E.2d 488, 490, 250 Ind. 269, 272 (1968). This test appears to be derived from *Henry v. United States*, in which the United States Supreme Court held that an arrest occurs when an officer restricts an individual's liberty of movement. 361 U.S. 98, 103 (1959). However, *Henry* pre-dates *Terry* by nine years and was decided at a time when the concept of seizure was synonymous with that of arrest—*Terry* stops had

Here, Shotts was stopped at gunpoint and pushed down onto a couch before being handcuffed. While the State correctly observed at oral argument that courts have refused to find the use of handcuffs to be wholly determinative, it has done little else to persuade us that this was a brief investigatory stop rather than a formal arrest for *Terry* purposes. We therefore decline the State's request to uphold the trial court's ruling under *Terry*. Instead, we choose to analyze this case under *Summers*, which applies specifically to seizures of individuals during the execution of search warrants.

## B. *Michigan v. Summers*

In *Summers*, police were executing a warrant authorizing a search of Summers's home for contraband. 452 U.S. at 693. Upon their arrival, they encountered Summers descending his front steps. *Id.* The officers then requested that Summers assist them in gaining entry to his home and detained him while they searched the premises. *Id.* The United States Supreme Court found that the officers acted constitutionally, holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to

---

not yet been recognized. Clearly, if the "not free to leave" test were applied to an individual who had been handcuffed, it would follow that he had been arrested, as no one could rightfully say that an individual in handcuffs would feel free to walk away. *But see Payne v. State*, 854 N.E.2d 1199, 1204-05 (Ind. Ct. App. 2006) (applying "not free to leave" test and holding that individual who had consented to being handcuffed "was not forcibly restrained against his will" and, therefore, not under arrest). This gives us further reason to hesitate in applying *Terry* to the facts of this case—in light of the fact that *Summers* presents an alternative means of deciding the issue—as our *Terry* jurisprudence seems to be in need of clarification.

detain the occupants of the premises while a proper search is conducted." *Id.* at 705.

[19]    In recognizing this exception, the Supreme Court balanced the intrusion into the defendant's liberty against the governmental interests at stake. *Id.* at 701-03. As to the intrusion into the defendant's liberty, the Court noted

> (1)    that a neutral and detached magistrate had already "authorized a substantial invasion of the privacy of the person who resided there," and that the "detention of one of the residents while the premises were searched . . . was surely less intrusive than the search itself,"
>
> (2)    the type of detention "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through detention," and
>
> (3)    because the defendant was detained in his "own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station."

*Id.* at 701-02.

[20]    As to the governmental interests at stake, the Court identified

> (1)    "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found,"

    (2)      "the interest in minimizing the risk of harm to the officers," noting that "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation," and

    (3)      the ability of "the occupants of the premises" to assist in "the orderly completion of the search," because their self-interest may compel them to do things such as open locked doors, allowing officers to avoid using force and damaging property.

*Id.* at 702-03.

[21] While the *Summers* Court engaged in a balancing of interests to create an exception to the probable cause requirement, it made clear that the exception it had created was categorical.

> [I]f police are to have workable rules, the balancing of the competing interests inherent in the *Terry* principle "must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers." The rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.

*Id.* at 705 n.19 (quoting *Dunaway*, 442 U.S. at 219-20); *see also Bailey*, 133 S.Ct. at 1037-38 ("The rule in *Summers* extends farther than some earlier exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers"). Thus, if a valid warrant exists to search certain property, officers

have "authority to detain the occupants of the premises while a proper search is conducted," without any degree of individualized suspicion. *Id.* at 705.

[22] The United States Supreme Court has clarified *Summers* in subsequent cases. Importantly, the Court has given some specific guidance regarding the amount of force that may be used to effectuate a detention under *Summers*. In *Muehler v. Mena*, police officers obtained a warrant to search a residence for evidence of gang activity. 544 U.S. 93, 95-96 (2005). When executing the search, the officers woke Mena, who was asleep in her bed, handcuffed her at gunpoint, moved her into a garage, and detained her there for the length of the search. *Id.* at 96.

[23] In analyzing this detention under *Summers*, the Court made clear that "[i]nherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* at 98-99. Regarding the use of handcuffs specifically, the Court noted

> The imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention in the converted garage. The detention was thus more intrusive than that which we upheld in *Summers*.
>
> ***
>
> But this was no ordinary search. The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises. In such inherently

dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants. Though this safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable.

*Id.* at 99-100 (citations omitted). The Court then held that the officers' detention of Mena in handcuffs for the length of the search was reasonable and did not violate the Fourth Amendment. *Id.* at 102.

[24] *Summers* was further clarified in *Bailey v. United States*, where the Court made clear that occupants may only be detained if they are within the immediate vicinity of the premises to be searched. 133 S.Ct. at 1042-43 (holding that the search of a residence did not justify the detention of a resident who was not on the property at the time of the search). From these holdings, it is clear that *Summers* allows officers who are executing a valid search warrant to use reasonable force to detain the occupants of the immediate vicinity of the premises to be searched for a reasonable period of time, which in many cases could mean the duration of the search.

[25] Shotts does not argue that the method or the length of his detention was unreasonable under *Summers*. Neither does he argue that it was unreasonable for Officer Hemphill to pat him down once he was handcuffed, as at that point he had told Officer Hemphill that he was armed.[9] Instead, Shotts argues that he

---

[9] We note that *Summers* does not authorize a pat-down or search of detained individuals. However, *Terry* permits "a reasonable search for weapons for the protection of the officer, where he has reason to believe that

was not an "occupant" of the premises under *Summers* because he was not a resident of the house.

[26] Shotts is correct to point out that the United States Supreme Court has never specified who qualifies as an "occupant."[10] Predictably, courts have reached different conclusions, with some holding that "occupant" includes only actual residents, others holding that it includes non-residents clearly associated with the residence or the criminal activity being investigated, and others holding that anyone on the premises counts as an "occupant." *See Cotton v. State*, 872 A.2d 87, 91 (Md. 2005) (discussing these three lines of cases). Shotts is also correct that the defendants at issue in *Summers*, and other United States Supreme Court cases applying its reasoning, have always been residents of the premises searched.[11] Appellant's Br. p. 16 n.4.

[27] Shotts argues that the "language and reasoning of *Summers* strongly suggest the term 'occupant' should be interpreted narrowly." Appellant's Br. p. 16. Shotts is correct that several of the factors the Supreme Court found relevant to its

---

he is dealing with an armed and dangerous individual . . . ." *Terry*, 392 U.S. at 27. There is no question that Officer Hemphill had such reason in this case, as Shotts told Officer Hemphill that he was armed.

[10] Although a concurring opinion in *Bailey* appears to define "occupants" as "persons within the immediate vicinity of the premises to be searched," this definition does not appear in the majority opinion. *Bailey*, 133 S.Ct. at 1043 (Scalia J., concurring). The concurrence makes very clear that it believes the rule in *Summers* allows officers to detain, in a reasonable manner, anyone found on the premises. *Id.* This is because, in the concurrence's view, the "*Summers* exception is appropriately predicated *only* on law enforcement's interest in carrying out the search unimpeded by violence or other disruptions." *Id.* at 1044 (emphasis original). However, this interpretation, while perhaps clearer than the majority's, garnered the support of only three justices.

[11] The only Indiana case to apply *Summers* also involved the detention of a resident. *Carroll v. State*, 822 N.E.2d 1083, 1083 (Ind. Ct. App. 2005).

decision in *Summers* do not apply, or are of diminished relevance, when the government seeks to detain non-residents. As for the intrusion into personal liberty, it cannot be said that a neutral and detached magistrate had already "authorized a substantial invasion of the privacy of the person who" was detained. *Summers*, 452 U.S. at 701. As for the governmental interests, "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found" may not apply with the same force to non-residents, especially those with no observed connection to any criminal activity. *Id.* at 702. Furthermore, non-residents are less likely to be able to assist officers with the search. *Id.* at 703.

[28] However, we believe that requiring the officers in this case to determine whether Shotts was a resident before detaining him would diminish the utility of *Summers*' bright-line rule. The very purpose of a bright-line rule is to keep an officer from having to make an ad hoc determination. *Summers* made clear that "the officer is not required to evaluate either the quantum of proof justifying the detention or the extent of the intrusion to be imposed by the seizure." *Id.* at 705 n.19. Requiring the officers to develop suspicion that Shotts was a resident before detaining him would be to require just such an ad hoc evaluation. Accordingly, we agree with the conclusion of the Maryland Court of Appeals that

[i]t follows, from *Summers* and *Buie*,[12] that, in executing a warrant [on premises] where the police are likely to encounter people who may well be dangerous, they are entitled, for their own safety and that of other persons, to take command of the situation and, except for persons who clearly are unconnected with any criminal activity and who clearly present no potential danger, essentially immobilize everyone until, acting with reasonable expedition, they know what they are confronting. It really cannot be otherwise. The police do not know who may be at the scene when they arrive. The people they find there, in or on the property to be searched, are not wearing identifying labels . . . .

*Cotton*, 872 A.2d at 92-93.

[29] Though *Summers* provided a number of justifications for its rule, it recognized "the interest in minimizing the risk of harm to the officers" as "sometimes of greater importance." *Summers*, 452 U.S. at 702.

When law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants. By taking 'unquestioned command of the situation,' the officers can search without fear that occupants, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search.

---

[12] *Maryland v. Buie*, 494 U.S. 325 (1990) (holding that the Fourth Amendment permits a limited protective sweep of a residence in conjunction with the in-home execution of an arrest warrant under appropriate circumstances).

*Bailey*, 133 S.Ct. at 1038 (quoting *Summers*, 452 U.S. at 703). Thus, for purposes of an analysis under *Summers*, we read the word "occupant" to mean anyone who is in the immediate vicinity of the premises to be searched at the time the search is executed. In this case, Shotts became an occupant when he entered the house and his detention was therefore justified under *Summers*.[13] As no Fourth Amendment violation occurred, the trial court did not err in denying Shotts's motion to suppress the handgun or in allowing the handgun into evidence.

[30] As a final note, we acknowledge that it seems as though Shotts should not have been allowed to enter the house in the first place. Though the State frequently refers to the scene as "secured," the record does not indicate what steps law enforcement generally takes to secure search scenes or whether the officers here took any steps to secure this particular scene. Appellee's Br. p. 18. The U.S. Supreme Court has addressed the issue of individuals trying to enter search scenes and noted that "[o]fficers can and do mitigate that risk . . . by taking routine precautions, for instance by erecting barricades or posting someone on the perimeter or at the door." *Bailey*, 133 S.Ct. at 1039. We would hope that officers usually take routine precautions such as these and that this case is an aberration.

---

[13] Here, we do not deal with a situation in which the officers either ordered or invited Shotts to enter the house. If such had been the case, we would have reached a different result. The purposes behind the *Summers* rule would not be served in such an instance, as the rule is not intended simply to provide officers with an opportunity to detain individuals.

# II.  Sentencing Issues

[31]    Shotts raises several issues related to his sentence.  Initially, we must address the fact that the trial court sentenced Shotts to 180 days, to run concurrently with his other sentence, for visiting a common nuisance.  Both Shotts and the State agree that this was error.  Although the State originally charged Shotts with visiting a common nuisance, it moved to dismiss the charge at trial and the trial court granted the motion.  Tr. p. 4.  Consequently, Shotts was neither tried nor convicted of the charge and we must remand to the trial court so that it may vacate Shotts's conviction and sentence for visiting a common nuisance.

[32]    As to Shotts's conviction for being a violent felon in possession of a firearm, the trial court sentenced him to eighteen years, with twelve years executed at the Department of Correction, two years executed at Community Corrections, and four years suspended.  This sentence fell within the statutory range—"[a] person who commits a Class B felony . . . shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years."  Ind. Code § 35-50-2-5.  However, Shotts argues that the trial court erred by relying on improper factors to enhance his sentence.  He also argues that his sentence is inappropriate in light of the nature of the offense and his character.

## A.  Aggravating Factors

[33]    In general, sentencing determinations lie within the discretion of the trial court.  *Henderson v. State*, 769 N.E.2d 172, 179 (Ind. 2002).  This includes a trial court's

decision to increase or decrease a presumptive sentence because of aggravating or mitigating circumstances. *Id.* However, a trial court errs if it considers aggravating or mitigating circumstances that are improper as a matter of law. *Anglemyer v. State*, 868 N.E.2d 482, 490-91 (Ind. 2007), *clarified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007).

[34] Shotts believes that the trial court erred by considering two improper aggravating circumstances—(1) the fact that his pre-sentence investigation (PSI) report listed him as "very high risk" to reoffend according to the Indiana Risk Assessment System (IRAS), and (2) the fact that he was convicted of robbery in 2009, as this offense served as the basis for his serious violent felon in possession of a firearm conviction.

[35] As to his IRAS score, Shotts is correct to note that "the offender risk assessment scores do not in themselves constitute, and cannot serve as, an aggravating or mitigating circumstance." *J.S. v. State*, 928 N.E.2d 576, 578 (Ind. 2010). This is because such assessments are prepared by probation officers and other administrators relying on data and evaluations that "are not necessarily congruent with a sentencing judge's findings and conclusions regarding relevant sentencing factors." *Malenchik v. State*, 928 N.E.2d 564, 573 (Ind. 2010). Accordingly, they are neither "intended nor recommended to substitute for the judicial function of determining *the length* of sentence appropriate for each offender." *Id*. (emphasis added). However,

> such evidence-based assessment instruments can be significant
> sources of valuable information for judicial consideration in

deciding whether to suspend all or part of a sentence, how to design a probation program for the offender, whether to assign an offender to alternative treatment facilities or programs, and other such corollary sentencing matters.

*Id.*

[36] Shotts argues that the trial court improperly considered his "very high risk" to reoffend assessment as an aggravating factor affecting the length of his sentence. He points out that the trial court listed "crim[inal] history, very high risk, on parole at time of offense" as aggravating factors in its written sentencing order. Appellant's App. p. 17. Shotts also notes that the trial court emphasized the score in its oral sentencing statement. Tr. p. 67.

[37] However, there is no indication from the trial court's use of the words "very high risk" in its written sentencing order that it meant to reference Shotts's IRAS score. Given Shotts's lengthy criminal history, which will be discussed later, the trial court had evidence before it from which it could reach its own, independent conclusion that Shotts was at a very high risk to reoffend. Accordingly, there is no reason to believe the trial court abdicated its judicial function in this case.

[38] As to the trial court's mention of Shotts's IRAS score in its oral sentencing statement, a review of the record makes clear that the trial court was considering the score in light of what type, rather than length, of sentence to impose. The trial court considered different rationales for placing individuals in the Department of Correction and concluded, with reference to Shotts's IRAS

score, that this was an appropriate way for him to serve his sentence. Tr. p. 67. As noted earlier, there is nothing improper in a trial court using an IRAS score to determine how an individual should serve his sentence.

[39] Shotts next argues that the trial court erred by considering his 2009 robbery conviction as an aggravating factor, as this conviction was an element of the current charge. Our Supreme Court has held that, "[w]here a trial court's reason for imposing a sentence greater than the advisory sentence includes material elements of the offense, absent something unique about the circumstances that would justify deviating from the advisory sentence, that reason is 'improper as a matter of law.'" *Gomillia v. State*, 13 N.E.3d 846, 852-53 (Ind. 2014) (quoting *Anglemyer*, 868 N.E.2d at 491).

[40] Shotts acknowledges that, in this case, "the trial court did not state specifically that it considered the robbery conviction," but he argues that "there are strong indications that the robbery conviction played a role in the court's decision." Appellant's Br. p. 40. We see no such indications. Shotts has a substantial criminal history aside from his 2009 robbery conviction that the trial court could have relied upon to enhance his sentence. There is simply no reason to believe that the trial court erred in the way that Shotts hypothesizes. Accordingly, we find no error in the sentencing order.

## B. Appropriateness of Sentence

[41] Finally, Shotts argues that his sentence is inappropriate and asks us to revise it to the advisory term of ten years. Under Indiana Appellate Rule 7(B), "[t]he

Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The burden is on the defendant to persuade us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[42] As to the nature of the offense, Shotts argues that it "was no more serious than any other conviction for unlawful possession of a firearm by a serious violent felon." Appellant's Br. p. 42. He also notes that the trial court did not find this case to be the "most egregious." Tr. p. 67. As to his character, Shotts notes that he is very close with his family and that his brother is willing to employ him once he is released. Appellant's Br. p. 42-43. He points out that he has completed his GED and has received a building trades vocational certificate from Ivy Tech. *Id.* at 43. He acknowledges his criminal history but notes that, at thirty years old, he is still relatively young. He points out that he was honest with the trial court about his substance abuse problems and that he is willing to participate in treatment. *Id.*

[43] We acknowledge that there is nothing about the nature of Shotts's offense that would warrant enhancing his sentence. All that the State was required to show was that Shotts was previously convicted of a felony listed in the statute and that he then knowingly or intentionally possessed a firearm. Ind. Code § 35-47-4-5. It is difficult to see how one could commit this crime, and this crime alone, in a particularly heinous manner.

[44] However, we cannot say that Shotts's sentence is inappropriate in light of his character. As a minor, Shotts's was adjudicated a delinquent child for truancy and possession of marijuana. Shotts has continued his criminal activity into adulthood, amassing convictions for escape, criminal recklessness, possession of marijuana, failure to stop at an accident, public intoxication, false reporting, auto theft, and carjacking. Appellee's Br. p. 39. He has previously had his probation revoked after consistent failure to report or comply with the conditions, and he was on parole at the time of this offense. Simply put, this evidence indicates a complete lack of respect for the law. The trial court could conclude that Shotts would continue his criminal activity despite his employment or any help he may receive from his family. We cannot say that the enhanced sentence imposed by the trial court was inappropriate under these circumstances.

[45] The judgment of the trial court is affirmed and remanded with instructions to vacate Shotts's conviction and sentence for visiting a common nuisance.

Bradford, J., and Pyle, J., concur.