FILED

Jan 31 2018, 10:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Joel M. Schumm
Christina L. Fisher, Certified Legal Intern
Appellate Clinic
IU Robert H. McKinney School of Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| **J.G.,** <br> *Appellant-Respondent,* <br><br> v. <br><br> **State of Indiana,** <br> *Appellee-Petitioner* | January 31, 2018 <br><br> Court of Appeals Case No. <br> 49A02-1706-JV-1419 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Gary K. Chavers, Magistrate <br><br> Trial Court Cause No. <br> 49D09-1703-JD-439 |

**Crone, Judge.**

## Case Summary

J.G. appeals his adjudication as a delinquent for dangerous possession of a firearm and carrying a handgun without a license, both class A misdemeanors if committed by an adult. He argues that his detention by police officers was unconstitutional; that his confession to possessing the handgun was not voluntary; that portions of an audio recording played at trial were inadmissible; and that the trial court should have vacated the true finding for carrying a handgun without a license on double jeopardy grounds. We conclude that his detention was not unconstitutional and his confession was voluntary; we presume that the trial court disregarded inadmissible portions of the audio recording; and we agree that the true finding for carrying a handgun without a license must be vacated. Therefore, we affirm the true finding for dangerous possession of a firearm and remand with instructions to vacate the true finding for carrying a handgun without a license.

## Facts and Procedural History

The facts most favorable to the true findings follow. Around 1:30 a.m. on Thursday, March 23, 2017, Indianapolis police officers received a radio dispatch about suspicious persons "pacing back and forth in front of" a Mexican restaurant in a strip mall on North High School Road. Tr. Vol. 2 at

40. According to Officer Jaime Thorn, who had patrolled that area for over seven years, "[t]here had been several attempted robberies at this business and other Hispanic businesses in the area …." *Id*. at 13. Within thirty seconds of receiving the dispatch, Officer Thorn arrived at the restaurant, which the owner had been closing for the night as the employees were walking to the parking lot. Officer Michal Dinnsen, who had patrolled the area for about two years, arrived seconds later. Officer Thorn spoke with the restaurant owner and an employee, who indicated that two black males wearing black jackets had run behind the strip mall. Officer Thorn "dispatched that information out on the radio to other officers responding" and asked Officer Dinnsen to drive around the back of the building. *Id*. at 10. Officer Dinnsen did so and saw two males "running eastbound into the Gateway apartments" behind the strip mall. *Id*. at 38. He "notified other responding officers" of what he had seen. *Id*.

[3] By that time, Officer Albert Teaters had driven into the Gateway apartment complex, which is in "a fairly high crime area." *Id*. at 13. Seconds after receiving Officer Dinnsen's dispatch, Officer Teaters saw two black males wearing black jackets; no one else was around. Officer Teaters "told them to stop and [he] held them at gunpoint" for his safety "until more officers could arrive …." *Id*. at 26. There had recently been a "rash of robberies" in the area, and Officer Teaters, who had patrolled the area for about two years, "didn't know if weapons were involved" in this situation. *Id*. at 26, 27. Officer Teaters "got on the radio and notified [Officer Dinnsen] that he had two suspects

stopped." *Id.* at 39. One of the suspects was fifteen-year-old J.G.,[1] and the other was O.D.

[4] Officer Dinnsen arrived within "fifteen or twenty seconds" and held the suspects at gunpoint while Officer Teaters handcuffed them. *Id.* Officer Dinnsen "asked them how old they were because they both looked young." *Id.* at 44. "[T]hey both told [him] their age and [he] realized they were both juveniles." *Id.* Officer Dinnsen notified Officer Thorn, who completed her investigation at the restaurant and joined her colleagues about ten minutes later.[2] The officers patted down J.G. and O.D. for contraband, spoke with a robbery detective, and realized that the juveniles' actions "didn't rise to the level of a robbery due to the fact that there was no demand for property and as a result [the officers] were going to take the juveniles back home to their parents." *Id.*

[5] Officer Dinnsen drove O.D. home, which took approximately ten or twelve minutes, and talked with O.D.'s mother and her boyfriend. The officer told them that "it appeared like this could've been a robbery" and that the officers "were concerned that there may be a gun …." *Id.* at 46. Based on this conversation, they all returned to the apartment complex. O.D. pointed to a bush, under which Officer Dinnsen found a loaded semiautomatic handgun.

---

[1] At trial, the parties stipulated that J.G. was born in September 2001. J.G.'s appellate brief incorrectly states that he was sixteen years old in March 2017.

[2] Officer Thorn had requested the assistance of a Spanish-speaking officer, who obtained additional information from the restaurant owner about the events that led his employees to call the police.

[6] Meanwhile, Officer Teaters drove J.G. home and talked with his mother. Officer Teaters was "getting ready to release" J.G. to his mother when Officer Dinnsen contacted him, told him that he had found a gun, and asked him to return to the apartment complex with J.G. and his mother. *Id.* at 33. Officer Teaters transported J.G., and J.G.'s mother drove her own car. When they arrived at the apartment complex, Officer Dinnsen gave J.G. and his mother a juvenile rights waiver form and read it over with them. The officer allowed them "to discuss everything" in private near J.G.'s mother's car. *Id.* at 50. After approximately ten minutes, at 4:29 a.m., J.G.'s mother stated that they would talk to the officer.

[7] Officer Dinnsen documented his interactions with J.G. and his mother with a digital audio recorder. The recording indicates that the officer removed J.G.'s handcuffs so that he could sign the waiver form. J.G.'s mother also signed the form. Both J.G. and his mother were aware that a gun had been found at the apartment complex. Officer Dinnsen said that he would test the gun for fingerprints and DNA, which would "let us know who's been touching the gun[,]" and asked J.G. if his DNA would be found on the gun. State's Ex. 3 (recording). J.G. said no. Officer Dinnsen stated that O.D.'s mother and boyfriend heard J.G. say that he had a gun as he and O.D. were leaving O.D.'s house that evening. J.G. denied saying that. The officer told J.G. that O.D. admitted there was a gun and that "everybody's saying it's your gun." *Id.* Officer Dinnsen told J.G. that it would cost $1000 to test the gun for DNA, recounted the events leading to J.G.'s detention and the discovery of the gun,

and said, "You see how this is playing out." *Id.* J.G.'s mother said, "Yeah, y'all had the gun." *Id.* J.G. told her to "be quiet." *Id.* She replied that O.D. and his mother said that J.G. had the gun, and she told her son, "You be the fool. You do what you want to do, bro. If you want to continue to tell them that, then go ahead, by all means necessary. I'm going back home to my baby." *Id.* J.G. then admitted that he had the gun. He claimed that he had found it several hours earlier, that he gave it to O.D. when the police arrived, and that O.D. threw it under the bush.

[8]     The State alleged that J.G. committed dangerous possession of a firearm and carrying a handgun without a license, both class A misdemeanors if committed by an adult. At trial, J.G. objected to the admission of the handgun and Officer Dinnsen's recording, claiming that his detention was unconstitutional, his confession was not voluntary, and the third-party statements on the recording were inadmissible. The trial court overruled the objections, entered true findings on both counts, and adjudicated J.G. a delinquent. The court stated that it would merge the second count into the first count, but the factfinding and dispositional orders do not mention merger. J.G. now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## Section 1 – J.G.'s detention did not violate the Fourth Amendment to the U.S. Constitution.

J.G. first contends that his detention by police violated the Fourth Amendment to the U.S. Constitution, and therefore the trial court should have excluded the handgun and his confession as fruits of that illegal seizure. The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The protections granted by the Fourth Amendment have been extended to the states through the Fourteenth Amendment." *J.B. v. State*, 30 N.E.3d 51, 54 (Ind. Ct. App. 2015). "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, homes, and belongings." *State v. Parrott*, 69 N.E.3d 535, 541 (Ind. Ct. App. 2017), *trans. denied*. The touchstone of a Fourth Amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). A warrantless seizure is per se unreasonable, and the State bears the burden to

show that one of the well-delineated exceptions to the warrant requirement applies. *Jacobs v. State*, 76 N.E.3d 846, 850 (Ind. 2017).

[10] "Generally speaking, evidence obtained pursuant to an unlawful seizure must be excluded under the fruit of the poisonous tree doctrine." *Clark v. State*, 994 N.E.2d 252, 266 (Ind. 2013). "This extension of the exclusionary rule bars evidence directly obtained by the illegal search or seizure as well as evidence derivatively gained as a result of information learned or leads obtained during that same search or seizure." *Id.*

> We review a trial court's decision regarding the admission of evidence for an abuse of discretion. An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts before the trial court. We consider any uncontested evidence favorable to the defendant, but we will not reweigh the evidence and will resolve any conflicts in the evidence in favor of the trial court's ruling. We conduct a de novo review of a trial court's ruling on the constitutionality of a search or seizure.

*Miller v. State*, 51 N.E.3d 313, 315 (Ind. Ct. App. 2016) (citations omitted). "We may affirm a trial court's decision regarding the admission of evidence if it

is sustainable on any basis in the record." *Neeley v. State*, 70 N.E.3d 866, 870 (Ind. Ct. App. 2017).[3]

[11]  To determine whether J.G.'s detention was an unreasonable seizure, we must determine which level of police investigation occurred. *Jamerson v. State*, 870 N.E.2d 1051, 1054 (Ind. Ct. App. 2007). "There are three levels of police investigation, two of which implicate the Fourth Amendment and one of which does not." *Id.*

> First, the Fourth Amendment requires that an arrest or detention that lasts longer than a short period of time be justified by probable cause. Second, pursuant to Fourth Amendment jurisprudence, the police may briefly detain an individual for investigatory purposes without a warrant or probable cause if, based upon specific and articulable facts, the officer has a reasonable suspicion that criminal activity has [occurred] or is about to occur. The third level of investigation occurs when a police officer makes a casual and brief inquiry of a citizen involving neither an arrest nor a stop. Such is a consensual encounter and does not implicate the Fourth Amendment.

*Id.* (citations omitted).

---

[3] We note that the handgun was tossed under a bush in the apartment complex before J.G. was detained and thus could be considered abandoned for Fourth Amendment purposes. *See J.B.*, 30 N.E.3d at 55 (concluding that appellant abandoned handgun by discarding it in a yard, "accessible to all[,]" after seeing officer's car but before he was detained). "It has long been held that abandoned property is not subject to Fourth Amendment protection." *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015), *trans. denied*. "The same is true under Article 1, Section 11 of the Indiana Constitution." *Id.* We note, however, that the State did not argue abandonment at trial or on appeal and that because we must determine the admissibility of J.G.'s confession to possessing the handgun in any event, we do not explore the matter further.

[12] J.G.'s encounter with the police officers at the apartment complex was not consensual, and thus the Fourth Amendment was implicated. J.G. argues that by holding him at gunpoint and handcuffing him, the officers conducted an arrest for which they did not have probable cause. "A police officer may arrest a suspect without a warrant if the officer has probable cause to believe the suspect has committed a felony." *Lamagna v. State*, 776 N.E.2d 955, 957-58 (Ind. Ct. App. 2002). "Probable cause to arrest exists where the facts and circumstances within the knowledge of an officer are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested committed it." *State v. Stevens*, 33 N.E.3d 1200, 1204-05 (Ind. Ct. App. 2015), *trans. denied*. "The level of proof necessary to establish probable cause is less than that necessary to establish guilt beyond a reasonable doubt. Probable cause, in fact, requires only a fair probability of criminal activity, not a prima facie showing." *Jellison v. State*, 656 N.E.2d 532, 534 (Ind. Ct. App. 1995).

[13] The State does not argue that the officers had probable cause to arrest J.G. for an offense when they held him at gunpoint. Instead, the State asserts that the officers had reasonable suspicion to detain J.G. for investigatory purposes and used reasonable force in doing so. In *Terry*, 392 U.S. 1, the U.S. Supreme Court established the rule that the police, without a warrant or probable cause, can briefly detain a person for investigatory purposes based on a reasonable suspicion of criminal activity. *Wilson v. State*, 670 N.E.2d 27, 29 (Ind. Ct. App. 1996). "Whether a particular fact situation justifies an investigatory stop is

determined on a case-by-case basis." *Crabtree v. State*, 762 N.E.2d 241, 246 (Ind. Ct. App. 2002). The Fourth Amendment's reasonable suspicion requirement "is satisfied where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred *or is about to occur.*" *Id.* (emphasis added).[4] "Reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* Likewise, "reasonable suspicion does not rise to the level of probable cause." *State v. Renzulli*, 958 N.E.2d 1143, 1146 (Ind. 2011). The existence of reasonable suspicion is determined by looking at the totality of the circumstances. *Dunson v. State*, 64 N.E.3d 250, 253 (Ind. Ct. App. 2016).

[14] Here, the facts known to the officers who responded to the first dispatch at 1:30 a.m. were that two persons were "pacing back and forth in front of" a restaurant that was located in a "fairly high crime area" and had been the target of "several attempted robberies[.]" Tr. Vol. 2 at 40, 13. Seconds after the officers arrived, a restaurant employee indicated that two black males wearing black jackets had run behind the building. In *Illinois v. Wardlow*, the U.S. Supreme Court acknowledged that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a

---

[4] J.G.'s suggestion that a completed crime is a prerequisite for a valid investigatory stop is contrary to established precedent.

reasonable, particularized suspicion that the person is committing a crime[,]" but emphasized that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." 528 U.S. 119, 124 (2000). The *Wardlow* court further observed that "[h]eadlong flight" from officers, although "not necessarily indicative of wrongdoing, … is certainly suggestive of such" and thus may also be considered in determining whether an investigatory stop is justified. *Id.* In response to Wardlow's argument that "there are innocent reasons for flight from police[,]" the court noted,

> Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.

*Id.* at 125 (citation omitted).

[15] In this case, not only did J.G. and O.D. pace back and forth in front of a restaurant in a high-crime area at closing time, when the owner was likely to be collecting the day's receipts,[5] but they also ran away when police officers arrived. All of this conduct was by itself lawful, but it also suggested that J.G.

---

[5] *See Morris v. State*, 271 Ind. 593, 596, 394 N.E.2d 151 (1979) (affirming robbery conviction, where appellant entered grocery store with armed companion at closing time: "At that time of the day the day's receipts would be present and the owner could be expected to be found alone.").

and O.D. were casing the restaurant for a planned robbery, which would not have been the first attempted at that location.[6] As the court in *Terry* stated, "[i]t would have been poor police work indeed" for the officers, who were familiar with the neighborhood, "to have failed to investigate this behavior further." 392 U.S. at 23.

[16] "An investigatory stop allows a police officer to 'temporarily freeze the situation in order to make an investigative inquiry.'" *Billingsley v. State*, 980 N.E.2d 402, 406 (Ind. Ct. App. 2012) (quoting *Johnson v. State*, 766 N.E.2d 426, 429 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied* (2013). "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Shotts v. State*, 53 N.E.3d 526, 532 (Ind. Ct. App. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)), *trans. denied*. "'Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Officer safety is a "legitimate and weighty" interest, and "'it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'" *Mimms*, 434 U.S. at 110

---

[6] For these reasons, we are unpersuaded by J.G.'s reliance on the factually dissimilar *Williams v. State*, 477 N.E.2d 96 (Ind. 1985).

(quoting *Terry*, 392 U.S. at 23). "But '[n]either Federal nor Indiana constitutional jurisprudence has developed a "bright line" test for determining when an investigatory detention moves beyond merely a *Terry* stop and becomes an arrest ….'" *Shotts*, 53 N.E.3d at 532 (quoting *Jones v. State*, 655 N.E.2d 49, 55 (Ind. 1995)). "Courts of this State have reached varied conclusions based on the unique facts presented by different scenarios." *Id.*

[17] J.G. relies on *Reinhart v. State*, 930 N.E.2d 42 (Ind. Ct. App. 2010), in arguing that he was arrested for Fourth Amendment purposes when he was held at gunpoint and handcuffed by Officers Teaters and Dinnsen. In *Reinhart*, a sheriff's deputy stopped the defendant's vehicle on suspicion of operating while intoxicated after the defendant pulled into and out of several driveways, drove left of center, and yelled out the window at the deputy. The deputy ordered Reinhart out of his vehicle at gunpoint, had him get on his knees with his hands behind his head, and then instructed him to lie on his stomach with his arms outstretched. Shortly thereafter, another officer handcuffed him, searched him, and discovered marijuana and signs of alcohol consumption. Reinhart was convicted of operating while intoxicated and marijuana possession.

[18] On appeal, Reinhart conceded that the initial traffic stop was valid but argued that it was "converted to an arrest requiring probable cause" when he was ordered out of vehicle at gunpoint and told to lie on the ground or, "at the very least," when he was placed in handcuffs. *Id.* at 45. Reinhart argued that the officers had no probable cause to arrest him and therefore the incriminating

evidence obtained after the seizure should have been excluded. The *Reinhart* court stated,

> This court has held that "[h]olding a person at gunpoint certainly restrains his liberty of movement and is a clear example of arrest," *especially when police have no reason to believe that a suspect is armed. See Taylor v. State*, 464 N.E.2d 1333, 1335 (Ind. Ct. App. 1984) (action of holding defendant at gunpoint constituted arrest when police had no reason to believe defendant was armed); *see also Williams v. State*, 630 N.E.2d 221, 224 (Ind. Ct. App. 1994) (ordering defendant to exit vehicle and lie on ground at gunpoint constituted arrest). In addition, placing a person in handcuffs may convert an investigatory stop into an arrest *depending upon the totality of the circumstances. Payne v. State*, 854 N.E.2d 1199, 1204-05 (Ind. Ct. App. 2006), *trans. denied*.

*Id*. at 46 (emphases added). The court observed that the deputy's "purported purpose in stopping Reinhart's vehicle was to investigate a drunk driver," and that although the deputy testified that "he was concerned with his safety based upon" Reinhart pulling into a driveway and "yelling out the window, there [was] no evidence suggesting that Reinhart engaged in any behavior which could have led to a specific reasonable inference that he was armed with a weapon. Therefore, under the circumstances, [the deputy's] action of ordering Reinhart to exit the vehicle at gunpoint was excessive" and "became an arrest without probable cause." *Id*. at 47, 48.

[19]   In so holding, the *Reinhart* court contrasted the facts of that case with those of *Willis v. State*, 907 N.E.2d 541 (Ind. Ct. App. 2009), in which officers responded to a late-night report that "an African-American male was holding a gun to the

head of another African-American male." *Id.* at 543. When the officers arrived, they saw two African-American males, one of whom was Willis, standing on the sidewalk. The officers drew their guns and "ordered the men to kneel with their hands raised." *Id.* The men were handcuffed, and the officers "searched the area to ensure no one had thrown away a handgun as [they] were arriving." *Id.* An officer noticed a bulge in Willis's pants pocket that the officer believed could contain a handgun. The officer obtained Willis's consent to search the pocket and found a bag of marijuana and a cell phone.

[20] Willis was convicted of marijuana possession and argued on appeal that he was arrested without probable cause when the officers "approached him with their guns drawn and put him in handcuffs." *Id.* at 545. The court disagreed, holding that the officers had reasonable suspicion to stop Willis and did not convert the stop into an unlawful arrest:

> Here, the police arrived at the scene moments after a caller reported a man holding a handgun to another man's head. In this circumstance, it would be unreasonable to expect a police officer to approach a suspect without his gun drawn, because the risk to the officer's safety is simply too great. Similarly, we believe the totality of the circumstances justifies the use of handcuffs on a suspect during the brief detention required to determine only whether that suspect possesses a handgun, which might be concealed on the suspect's person and easily accessible if the suspect's hands are free. We decline to hold the brief intrusion into Willis' privacy and the brief deprivation of his liberty of movement were constitutionally unreasonable as an investigative stop under the facts facing the officers in this case.

*Id.* at 546.

[21] The facts of this case fall somewhere between those of *Reinhart* and *Willis* on the Fourth Amendment continuum. Officers Thorn, Dinnsen, and Teaters received a report of two persons pacing back and forth in front of a restaurant in a high-crime area at 1:30 a.m. The report did not mention a firearm, but the restaurant had been the target of robberies (i.e., forcible felonies) in the past, and Officer Teaters was by himself when he encountered two males matching the description of the pair seen running into the apartment complex behind the restaurant. Given the totality of these circumstances, we conclude that it was reasonable for Officer Teaters to hold J.G. at gunpoint until Officer Dinnsen arrived and for the pair to be handcuffed while the officers investigated their suspicious behavior. Officer Dinnsen promptly determined that J.G. was a juvenile, at which point the officers had probable cause to detain him for a curfew violation. *See* Ind. Code §§ 31-37-3-2(a) (making it a curfew violation for children ages fifteen through seventeen to be in a public place after 11 p.m. and before 5 a.m. on Wednesdays and Thursdays), 31-37-2-5 (making a curfew violation a delinquent act), and 31-37-4-2 (stating that "[a] child may be taken into custody by a law enforcement officer acting with probable cause to believe that the child has committed a delinquent act.").[7] In sum, the officers' use of

---

[7] Indiana Code Section 31-37-3-2(b) provides that a law enforcement officer "may not detain a child or take a child into custody" for a curfew violation unless the officer, "after making a reasonable determination and considering the facts and surrounding circumstances, reasonably believes that" the child has violated curfew and "there is no legal defense to the violation." J.G. does not assert, and the record does not suggest, that he had a defense to the curfew violation, such as returning from lawful employment or a school-sanctioned activity. *See* Ind. Code § 31-37-3-3.5 (listing defenses to curfew violation).

force did not convert the investigatory stop into an arrest without probable cause and therefore did not violate the Fourth Amendment.

## Section 2 – J.G.'s detention did not violate Article 1, Section 11 of the Indiana Constitution.

J.G. also argues that his detention violated Article 1, Section 11 of the Indiana Constitution, which "safeguards the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure.'" *Watkins v. State*, 85 N.E.3d 597, 600 (Ind. 2017). "Although its text mirrors the federal Fourth Amendment, we interpret Article 1, § 11 of our Indiana Constitution separately and independently." *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). A Fourth Amendment analysis turns on whether the subject has a reasonable expectation of privacy, whereas a Section 11 analysis "turns on whether the police conduct was reasonable under the totality of the circumstances." *Carpenter v. State*, 18 N.E.3d 998, 1001-02 (Ind. 2014). In making this evaluation, we apply the test established by our supreme court in *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005), which is "our 'faithful stand-by' to determine reasonableness under our Constitution and is appropriate for a range of contexts." *Watkins*, 85 N.E.3d at 600. The "reasonableness of a search or seizure [turns] on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the

extent of law enforcement needs." *Litchfield*, 824 N.E.2d at 361.[8] "The State bears the burden to show the intrusion was reasonable." *Carpenter*, 18 N.E.3d at 1002.

[23] Regarding the first *Litchfield* factor, J.G. argues that "there was no articulable suspicion and no knowledge that any violation had occurred. The police simply knew … that there had been a report of a suspicious person, without any reports of any actual criminal acts." Appellant's Br. at 20. Notwithstanding the *Litchfield* court's use of the past tense ("violation has occurred"), numerous pre- and post-*Litchfield* cases have declared that detentions to investigate possible future criminal activity are reasonable under Article 1, Section 11. *See, e.g.*, *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001) ("A police stop and brief detention of a motorist is reasonable and permitted under Section 11 if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity."); *State v. Cunningham*, 26 N.E.2d 21, 26 (Ind. 2015) ("Likewise, we have held that Article 1, Section 11 of the Indiana Constitution likewise 'permits police to stop and briefly detain a motorist if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity,' including a traffic violation.") (quoting *Mitchell*, 745 N.E.2d at 787). In this case, the degree of concern or suspicion that J.G. and O.D. were

---

[8] Citing pre-*Litchfield* cases, the State suggests that our Section 11 analysis should be governed by *Terry* instead of *Litchfield*. Appellee's Br. at 24-25. Given the plain wording of *Litchfield* (and in light of *Watkins*, which was handed down after the State filed its appellee's brief), this suggestion is not well taken.

about to rob the restaurant was high, given the totality of the circumstances mentioned above.

[24] With respect to the second *Litchfield* factor, J.G. argues that his detention "imposed a substantial, and unreasonable, intrusion on [his] ability to go about his ordinary activities. He was detained for three hours, in the middle of the night, unable to leave, and generally unable to use his hands, or even put them in his pockets to keep them warm in the cold air." Appellant's Br. at 20. As a juvenile, J.G. should not have been roaming the streets at 1:30 a.m. Officer Teaters was alone when he confronted the suspected would-be robbers in the apartment complex behind the restaurant. There had been a "rash of robberies" in the area, and the officer "didn't know if weapons were involved" in this situation. Tr. Vol. 2 at 26, 27. Under these circumstances, we cannot say that the degree of intrusion used to conduct the investigatory stop was unreasonable. *See Saffold v. State*, 938 N.E.2d 837, 840 (Ind. Ct. App. 2010) ("In determining reasonableness under Section 11, we recognize that Indiana citizens are concerned not only with personal privacy but also with safety, security, and protection from crime. When government intrusion is challenged under Section 11, therefore, reasonableness under the totality of circumstances may include consideration of police officer safety.") (citation omitted), *trans. denied* (2011). Once it was determined that J.G. was a juvenile, the officers were justified in detaining him for a curfew violation until he could be released to his mother, which did not occur due to the discovery of the handgun at the apartment complex. J.G. does not specifically argue that it was unreasonable for Officer

Teaters to transport him back to the apartment complex in handcuffs to continue the investigation.

As for the third *Litchfield* factor, J.G. argues that

> the purposes of law enforcement could have been sufficiently served by monitoring the store for actual criminal activity. Even if police believed they needed to talk to the suspicious individuals, they could have restricted their interaction to a conversation—not an arrest at gunpoint—once they had caught up with them in the apartment complex.

Appellant's Br. at 20. We have already determined that J.G. was not arrested, and given the significant possibility that the suspected would-be robbers might be armed, the officers' need to use force to detain the fleeing J.G. for investigatory purposes was substantial. All three *Litchfield* factors weigh in the State's favor, and therefore we conclude that J.G.'s detention did not violate Article 1, Section 11 of the Indiana Constitution.

## Section 3 – J.G.'s confession was voluntary.

J.G. contends that his incriminating statements to Officer Dinnsen were not voluntary and therefore the trial court erred in admitting them.[9] "Unlike the Federal Constitution, Indiana law imposes on the State the burden of proving

---

[9] J.G. does not challenge the voluntariness of his or his mother's waiver of his rights under the juvenile waiver statute and makes only a general voluntariness argument based on a case involving an adult defendant. Because J.G. does not make a juvenile-specific argument, we respond to the argument as raised in his brief.

beyond a reasonable doubt that a confession is voluntary." *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009), *cert. denied* (2010).

> In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including any element of police coercion; the length, location, and continuity of the interrogation; and the maturity, education, physical condition, and mental health of the defendant. To determine that a statement was given voluntarily, the court must conclude that inducement, threats, violence, or other improper influences did not overcome the defendant's free will.

*Id*. (citation and quotation marks omitted). "On appeal, the trial court's determination of voluntariness is reviewed as other sufficiency matters. We do not reweigh the evidence, and we affirm the trial court's finding if it is supported by substantial evidence." *Id*. (citation omitted). The trial court in this case did not make a specific finding that J.G.'s statements were voluntary, but it did admit them over J.G.'s objections.

[27]  J.G. was fifteen years old, with no obvious educational, physical, or mental deficits. He was roaming the streets unsupervised at 1:30 on a Thursday morning, which explains why he was detained and questioned at such a late hour. J.G.'s three-hour detention encompassed the initial investigation at the apartment complex, the ride to his mother's house to be released to her custody, and the return trip to the apartment complex for further investigation after the handgun was found. The interrogation itself lasted only a matter of minutes and occurred after J.G. discussed the situation privately with his mother near her vehicle.

J.G. notes that the weather was cold and that he was not released from his handcuffs until after he agreed to sign the waiver form, but there is simply no evidence that these considerations factored into his decision to answer Officer Dinnsen's questions.[10] J.G. also notes that the officer twice mentioned the $1000 cost of DNA testing and asserts that "[t]hese statements exacted pressure on [him] to admit that his DNA would be on the gun, so police would not have to run the expensive DNA tests." Appellant's Br. at 22-23. He further asserts that, "[a]s a minor, [he] may well have believed that the officer was telling him about the cost of the testing because he would somehow be responsible for the cost." *Id.* at 23. We agree with the State's assessment that, "[t]o the extent [Officer] Dinnsen's remark meant anything, it was that no one wanted to do DNA testing and that J.G. should tell the truth and dispense with the need for testing." Appellee's Br. at 32. Based on the foregoing, we conclude that the trial court's implicit ruling that J.G.'s statements were voluntary is supported by substantial evidence.

## Section 4 – We presume that the trial court disregarded inadmissible portions of Officer Dinnsen's audio recording.

Over J.G.'s objections, the trial court listened to Officer Dinnsen's audio recording of his interactions with J.G. and his mother, which contained J.G.'s

---

[10] At trial, Officer Dinnsen testified that J.G. was not in handcuffs during his private conversation with his mother, but the recording establishes otherwise. The outdoor temperature that night is unknown, but as Officer Dinnsen removed J.G.'s handcuffs, he remarked, "I bet your hands are cold out here, man. I'm gonna let you put them in your pockets again." State's Ex. 3. J.G. was wearing a jacket, and there is no indication that anything other than his hands might have been cold.

confession to possessing the handgun as well as the officer's account of what O.D. and his mother and her boyfriend had said about the handgun. J.G. contends that the trial court should have excluded the recording because the third-party statements were inadmissible hearsay and violated his right to confrontation under the U.S. Constitution.

[30] It is questionable whether the third-party statements are hearsay.[11] In any case, the trial court indicated that it would disregard inadmissible statements as it listened to the audio recording, and we presume that it did so. *See Hinesley v. State*, 999 N.E.2d 975, 987 (Ind. Ct. App. 2013) ("We generally presume that in a proceeding tried to the bench, a court renders its decisions solely on the basis of relevant and probative evidence. This longstanding principle has been termed the judicial-temperance presumption. We presume that the trial judge is aware of and knows the law and considers only evidence properly before him or her in reaching a decision. The risk of prejudice is quelled when the evidence is solely before the trial court.") (citations omitted), *trans. denied* (2014). J.G. offers nothing to rebut this presumption in his reply brief, so we find no basis for reversal here.

---

[11] Hearsay is a statement that "it not made by the declarant while testifying at the trial or hearing" and "is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible unless the evidence rules or other law provides otherwise. Ind. Evidence Rule 802. There is no indication that the State offered the third-party statements in evidence to prove that J.G. possessed the handgun.

## Section 5 – The true finding for carrying a handgun without a license must be vacated.

[31]    Finally, J.G. contends, and the State properly concedes, that the true finding for carrying a handgun without a license should be vacated on double jeopardy grounds and that remand is necessary to correct the trial court's orders. We affirm the true finding for dangerous possession of a firearm and remand with instructions to vacate the true finding for carrying a handgun without a license.

[32]    Affirmed and remanded.


Robb, J., and Bradford, J., concur.